# EXHIBIT A

COPIES OF ALL PROCESS, PLEADINGS, AND ORDERS
SERVED IN STATE COURT

## INDEX OF DOCUMENTS

Exhibit A-1    Docket Sheet from State Court Action

Exhibit A-2    Petition to Compel Arbitration

Exhibit A-3    Service Request Form

Exhibit A-4    Citation and Return of Service for Defendant Papalote Creek II LLC

# EXHIBIT A-1

## DOCKET SHEET FROM STATE COURT ACTION

**TRAVIS COUNTY**
**District Clerk**
**DMS Case Document List**

Cause Number:  D-1-GN-15-002592

| File Date | Category | Description | Additional Info |
|-----------|----------|-------------|-----------------|
| 06/30/2015 | PET-PL | ORIGINAL PETITION/APPLICATION | PETITION TO COMPEL ARBITRATION |
| 07/01/2015 | OTHER | OTHER FILING | SERVICE REQUEST FORM |
| 07/15/2015 | SRVPROCESS | EXECUTED SERVICE | CITATION-PAPALOTE CREEK II LLC |

# EXHIBIT A-2

## PETITION TO COMPEL ARBITRATION

6/30/2015 6:16:02 PM
**Velva L. Price**
**District Clerk**
**Travis County**
D-1-GN-15-002592

CAUSE NO.  **D-1-GN-15-002592**

| | | |
|---|---|---|
| LOWER COLORADO RIVER AUTHORITY, | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| V. | § | **126TH**   JUDICIAL DISTRICT OF |
| | § | |
| PAPALOTE CREEK II, LLC f/k/a PAPALOTE | § | |
| CREEK WIND FARM II, LLC, | § | |
| Defendant. | § | TRAVIS COUNTY, TEXAS |

## PETITION TO COMPEL ARBITRATION

TO THE HONORABLE JUDGE OF SAID COURT:

Lower Colorado River Authority ("LCRA"), Plaintiff herein, makes application to this Court for an order compelling Papalote Creek II, LLC f/k/a Papalote Creek Wind Farm II, LLC ("Papalote"), Defendant herein, to engage in arbitration pursuant to a written arbitration agreement entered by and between the parties, and in support thereof would respectfully show as follows:

## I.    INTRODUCTION

1.0     LCRA seeks to enforce the terms of a Power Purchase Agreement entered into by and between LCRA and Papalote and dated December 18, 2009, a true and correct copy of which is attached hereto as **Exhibit A** and incorporated by reference.  The Power Purchase Agreement contains an arbitration clause that provides for the submission to arbitration of any disputes arising between and among LCRA and Papalote.  A dispute has arisen between the parties over the scope and interpretation of provisions in the Power Purchase Agreement concerning limitations on LCRA's liability under the contract.  Because the arbitration clause is enforceable, and because LCRA's claims clearly fall within its scope, the Court should grant LCRA's Petition to Compel Arbitration.

## II.   PARTIES

2.0      LCRA is a conservation and reclamation district created by an act of the 43rd Legislature, now codified at Chapter 8503 of the Texas Special District Local Laws Code, and thus a political subdivision of the State of Texas.  LCRA maintains its principal office in Austin, Travis County, Texas.

2.1      Papalote is a limited liability company organized and existing under the laws of the State of Delaware.   Papalote may be served with citation directed to its registered agent, The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.

## III.   JURISDICTION AND VENUE

3.0      The Court has jurisdiction over this petition pursuant to Section 171.081 of the Texas Civil Practice and Remedies Code.  Venue is appropriate pursuant to Section 171.096(b) of the Texas Civil Practice and Remedies Code because the arbitration agreement directs that the arbitration shall commence in the county where the initiating party maintains its home office. LCRA is the initiating party and has its home office in Travis County, Texas.

## IV.   APPLICATION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

4.0      On December 18, 2009, LCRA and Papalote entered into the Power Purchase Agreement that provides for the sale by Papalote, and the purchase by LCRA, of electricity and other services and benefits relating to a wind generation facility located in San Patricio County, Texas. A dispute has arisen between LCRA and Papalote regarding the interpretation and effect of a contractual provision relating to LCRA's limitation of liability under the Power Purchase Agreement, and its impact on LCRA's performance obligations thereunder.  In May and June 2015, the parties' senior officers and/or executives held numerous meetings, both in person and

over the telephone, in furtherance of efforts to resolve the dispute. Despite such efforts the parties have been unable to reach a resolution of the dispute.

4.1     Article 13.1 of the Power Purchase Agreement provides that if a dispute arises between the parties, then the parties' senior officers and/or executives shall meet to attempt to resolve the dispute. If an agreeable resolution is not achieved then either party may submit the dispute to arbitration. To this end, Article 13.2 of the Power Purchase Agreement provides:

> either Party may submit any disputes arising under this Agreement, which cannot be resolved by the Parties to binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") effective at the time of the dispute (the "AAA Rules") and the terms of this Section 13.2. If the AAA Rules are in conflict with this Section 13.2 including the provisions concerning the appointment of arbitrators, the provisions of this Section 13.2 shall control.

The agreement further provides that either party may initiate arbitration by delivering to the other a written notice requesting arbitration if the senior officers and/or directors are unable to resolve the dispute within ten days after their initial meeting, with the other party to respond to such request within ten business days.

4.2     On June 19, 2015, LCRA made written demand for arbitration, a true and correct copy of which is attached hereto as **Exhibit B** and incorporated by reference. This demand came more than ten days following a May 26, 2015 meeting between the parties' senior officers and executives to resolve the dispute. Despite the conditions precedent having been satisfied by LCRA, Papalote refuses to acknowledge that the arbitration procedure has been properly invoked under the Power Purchase Agreement, and is refusing to follow the arbitration procedure outlined in Article 13 of the Power Purchase Agreement. Indeed, Papalote takes the position that arbitration is premature and improper because no breach of the Power Purchase Agreement has occurred; however, this position is in clear conflict with the express terms of Article 13 of the

Power Purchase Agreement requiring continued performance during the arbitration process, as well as the numerous meetings and telephone calls between the parties in their attempts to resolve the dispute.

4.3     LCRA has retained the law firm of Jackson Walker L.L.P. to represent LCRA in this action and has agreed to pay the firm's reasonable and necessary attorney's fees in connection with the prosecution of this action.

## V.     PRAYER

WHEREFORE, Plaintiff Lower Colorado River Authority requests that Defendant Papalote Creek II, LLC f/k/a Papalote Creek Wind Farm II, LLC be cited to appear and answer, and that LCRA obtain the following relief:

a.     Papalote be ordered to submit the dispute between the parties to arbitration in accordance with the terms of Article 13 of the Power Purchase Agreement dated December 18, 2009;

b.     Recovery of LCRA's reasonable and necessary attorney's fees;

c.     Costs of suit;

d.     Such other and further relief to which LCRA may be justly entitled.

Respectfully submitted,

**JACKSON WALKER L.L.P.**
100 Congress Avenue, Suite 1100
Austin, Texas  78701
(512) 236-2000
(512) 236-2002 - Fax
Email:  rneblett@jw.com
Email:  bharrison@jw.com


By: */s/ Robert B. Neblett III*
    Robert B. Neblett III
    State Bar No. 14849300
    Breck Harrison
    State Bar No. 24007325

ATTORNEYS FOR PLAINTIFF,
LOWER COLORADO RIVER AUTHORITY

CAUSE NO. _____

| | | |
|---|---|---|
| LOWER COLORADO RIVER AUTHORITY | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| vs. | § | _____ JUDICIAL DISTRICT OF |
| | § | |
| PAPALOTE CREEK II, LLC f/k/a PAPALOTE | § | |
| CREEK WIND FARM II, LLC | § | TRAVIS COUNTY, TEXAS |
| Defendant. | § | |

## AFFIDAVIT OF RICHARD WILLIAMS

| | |
|---|---|
| STATE OF TEXAS | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared Richard Williams, known to me as that person, and after being duly sworn, stated under oath the following:

1.     "My name is Richard Williams. I am over the age of eighteen years. I am of sound mind, capable of making this affidavit, and personally acquainted with the facts stated herein.

2.     I am the Chief Financial Officer for the Lower Colorado River Authority ("LCRA"). My business address is 3700 Lake Austin Boulevard, Austin, Texas 78703.

3.     On or around May 26, 2015, myself and other senior officers and executives of LCRA personally met with senior officers and/or executives of Papalote Creek II, LLC f/k/a Papalote Creek Wind Farm II, LLC ("Papalote") in an effort to resolve the dispute that forms the basis for LCRA's Petition to Compel Arbitration. At this meeting, LCRA and Papalote were unable to reach a resolution of the dispute.

4.     On or around June 19, 2015, LCRA sent a Notice of Arbitration to Papalote (the "Notice") invoking the arbitration procedure set forth in Article 13 of the Power Purchase Agreement. Attached hereto as **Exhibit A**, and incorporated by reference herein, is a true and correct copy of the Power Purchase Agreement and subsequent Amendment to Power Purchase Agreement entered into by LCRA and Papalote. Also attached hereto as **Exhibit B**, and incorporated by reference herein, is a true and correct copy of the Notice.

5.     Based on my knowledge of LCRA's business records and record-keeping practices and procedures, the attached Power Purchase Agreement, Amendment to Power Purchase Agreement

and Notice of Arbitration are true and correct copies of the original documents kept by LCRA in the ordinary course of business.  The records attached hereto are exact duplicates of the original.

6.    It is the regular practice of LCRA to make such a record of transactions in the ordinary course of business.

7.    I declare under penalty of perjury, under the laws of the State of Texas, that the foregoing is a true and correct.

8.    FURTHER AFFIANT SAYETH NAUGHT."

_____
Richard Williams

SUBSCRIBED AND SWORN TO BEFORE ME by Richard Williams, 30th day of
June 2015.

LORRIE A. HAYWOOD
Notary Public, State of Texas
My Commission Expires
January 25, 2018

_____
Notary Public, State of Texas

# EXHIBIT A

ORIGINAL

EXECUTION VERSION 12-18-09

## POWER PURCHASE AGREEMENT

This Power Purchase Agreement is entered into effective as of the 18th day of December, 2009 (the "Effective Date"), by and between Papalote Creek Wind Farm II LLC, a Delaware limited liability company (the "Seller"), and The Lower Colorado River Authority, a Texas conservation and reclamation district   (the "Buyer"), herein sometimes referred to individually as a "Party" and collectively as the "Parties".

## RECITALS

1.  Seller intends to develop, design, construct, own and operate  a wind generation facility known as the Papalote  Creek II Wind Project (as further described in Exhibit A , the "Project") which will include up to 87 Siemens  model 101 2.3  MW wind turbines, to be located on the property in the general vicinity of the Pelican Switch Substation in San Patricio County, Texas, as described in Exhibit B;

2.   Buyer wishes to purchase, and Seller wishes to sell the entire capacity, electric energy, Ancillary Services and environmental Credits from  the Project with an expected total nameplate capacity of approximately   200.1 MW   in accordance with the terms hereof; and

3. Buyer has accepted Seller's offer to sell the Product, as defined hereinafter, in accordance with the terms of this Agreement;

NOW THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller agree as follows:

## ARTICLE 1

## DEFINITIONS

**1.1 Definitions**.  As used in this Agreement, the following terms shall have the respective meanings set forth below. Certain other capitalized terms that are not defined herein shall have the meanings ascribed to them in the ERCOT Protocols or the Nodal Protocols, as applicable.

 "AAA" has the meaning given to such term in Section 13.2

 "AAA Rules" has the meaning given to such term in Section 13.2.

 "Affiliate" means any Person that directly or indirectly Controls, is Controlled by, or is under common Control with another Person.

"Agreement" means this Power Purchase Agreement, together with all of its Exhibits and Schedules, as amended from time to time.

"Alternate" has the meaning given to such term in Section 3.15(b).

"Ancillary Services" means the ancillary services described in Section 6 of the ERCOT Protocols as of the Effective Date and any future ancillary services developed by ERCOT during the Term which services Buyer may provide or sell from the Project.

"Annual Average LCRA SPP" means the sum of the Weighted Monthly Average LCRA SPP for all Months in a Calendar Year.

"Authorized Representative" has the meaning given to such term in Section 3.15(b).

"Back-up Meter" has the meaning given to such term in Section 3.20.

"Bankruptcy Proceeding" means, with respect to a Party, that such Party (a) is dissolved (other than pursuant to a consolidation, amalgamation, or merger); (b) becomes insolvent or is generally unable to pay its debts or generally fails or admits in writing its general inability to pay its debts as they become due; (c) makes a general assignment, arrangement or composition with or for the benefit of creditors; (d) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditor's rights, or a petition is presented for its winding-up or liquidation; (e) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation, or merger); (f) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian, or other similar official for it or substantially all its assets; (g) has a secured party take possession of all or substantially all of its assets, or has a distress, execution, attachment, sequestration or other legal process levied, enforced, or sued on or against all or substantially all of its assets; (h) causes or is subject to any event with respect to it which, under the applicable Laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (a) to (g) inclusive; or (i) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts, and in the case of clauses (a) to (g) inclusive where the act or action taken is involuntary, such act or action is not dismissed within sixty (60) Days of its commencement.

"Business Day" means any Day except a Saturday, Sunday, or NERC holiday, beginning at 8:00 a.m. and ending at 5:00 p.m. CPT, provided that, exclusively for purposes of Sections 7.1, 7.3, 10.3 and 10.4 a Federal Reserve Bank holiday shall be deemed included in this definition.

"Buy Down Payment" has the meaning given to such term in Section 2.3.

"Casualty Buy Down Payment" has the meaning given to such term in Section 3.9.

"Casualty Event" has the meaning given to such term in Section 3.9.

"Commercial Operation" means, with respect to any wind turbine, that all of the following conditions have been fulfilled: (i) the Interconnection Agreement has been executed and delivered, (ii) such wind turbine is able to generate electric energy, (iii) such wind turbine has been satisfactorily tested, as evidenced by an officer's certificate of Seller.

"Commercial Operation Date" or "COD" means the date when a minimum of seventy-five percent (75%) of the Project's Turbines achieve Commercial Operation.

"Communication Equipment" has the meaning given to such term in Section 3.20.

"CPT" means Central Prevailing Time, meaning prevailing Standard Time or Daylight Savings Time in the Central Time Zone.

"Commercially Reasonable Efforts" means, with respect to any Person, the level of effort and expenditure of funds that, under the circumstances, are commercially and technically reasonable and acceptable in the industry of such Person.

"Contract Year" means each calendar year during the Term, commencing on COD, provided that if the first and last Contract Years are not full calendar years, the first Contract Year means the period from COD through December 31 of such calendar year, and the last Contract Year means the period from January 1 of the last Contract Year through the last Day of the Term.

"Contract Year Actual Metered Output" means the sum of Net Electricity that Seller actually delivers to Buyer during any Contract Year plus Deemed Generated Energy, if any, during such Contract Year.

"Contract Year Expected Metered Output" means the amount of Net Electricity Seller expects to deliver to Buyer during any Contract Year during the Term  equal to six hundred and sixty two gigawatt hours ( 662 GWh) prorated in any partial Contract Year.

"Contract Year Minimum Metered Output" means the amount of  Net Electricity equal to seventy –five percent (75%) of the Contract Year Expected Metered Output , as adjusted, if applicable, in accordance with Section 3.9.

 "Contract Price" has the meaning given to such term in Section 3.3.

"Control" and the correlative terms "Controls" and "Controlled by" means the possession or ownership, directly or indirectly, of the following:  (a) in the case of a corporation, 50% or more of the outstanding voting securities thereof; (b) in the case of a limited liability company, partnership, limited partnership or venture, 50% or more of the voting rights therein; (c) in the case of a trust or estate, 50% or more of the beneficial interest therein; (d) in the case of any other entity, 50% or more of the economic or beneficial interest therein; or (e) in the case of any other entity, the power or authority, through the ownership of voting securities, by agreement or otherwise, to direct the management, activities or policies of the entity.

"Costs" means, with respect to the Non-Defaulting Party, brokerage fees, commissions and other similar third party transaction costs and expenses (including costs incurred in connection with transmission services that would otherwise not have been incurred hereunder) reasonably incurred by such Party either in terminating any arrangement pursuant to which it has hedged its obligations or entering into new arrangements which replace this Agreement and all reasonable attorneys' fees and expenses incurred by the Non-Defaulting Party in connection with this Agreement.

"Credit Enhancements" has the meaning given to such term in Section 10.2.

3

"Credit Requirements" means, with respect to any Person, that such Person or its guarantor(s) meets or exceeds the Ratings Threshold or (b) has issued or posted, or has caused to be issued or posted, the applicable Credit Support.

"Credit Support" means collateral in the form of either cash, Letter(s) of Credit, a guaranty from a guarantor whose credit ratings meet or exceed the Ratings Threshold or other security acceptable to the requesting Party, in its sole discretion.

"Credits" means any credits, credit certificates or similar items such as those for greenhouse gas reduction, or the generation of green power or renewable energy, as well as any capacity credits, renewable energy credits (RECs), tradable generation rights , pollution/emission credits or other associated benefits, in each case created and defined by a Governmental Entity, attributable to the generation, purchase, sale or use of  Net Electricity  from or by the Project during the Term commencing on the date when the first delivery hereunder of Test Energy occurs but specifically excluding (i) any and all state or federal tax credits, Federal Production Tax Credits, investment tax credits and any other tax credits or benefits which are or may be generated by the Project , or (ii) ) any state, federal or private cash payments or grants or other benefits relating in any way to  the Project and the output thereof.

"Day" means a period of twenty-four (24) consecutive hours beginning at 00:00 hours CPT on any calendar day and ending at 24:00 hours CPT on the same calendar day.

"Deemed Generated Energy" means the quantity of electric energy determined in accordance with Section 4.4 and expressed in MWh that could reasonably have been produced by  the Project and delivered at the Delivery Point during any period, but was not actually produced.

 "Delayed Turbines" means any of the Project's Turbines failing to achieve Commercial Operation on the Scheduled Commercial Operation Date.

"Delivery Point" means the point where the Project is interconnected with the Transmission System, which shall be the 138 kV busbar at the Pelican Switch station located on the Lon C. Hill-to-Whitepoint   138 kV transmission line, so designated by ERCOT.

"Downgrade" has the meaning given to such term in Section 10.1

"DPLA" has the meaning given to such term in Section 10.1.

 "Early Termination Date" has the meaning given to such term in Section 6.2(c).

"Effective Date" means the date set forth in the Preamble.

"Emergency Condition" has the meaning given to such term in Section 2 of the ERCOT Protocols.

"ERCOT" means the Electric Reliability Council of Texas, Inc. or its successor.

"ERCOT-Directed Curtailment" has the meaning given to such term in Section  3.7.

"ERCOT Protocols" means the documents adopted by ERCOT, including any attachments or exhibits referenced in the documents, as amended from time to time, containing the

4

scheduling, operating, planning, reliability, and settlement policies, rules, guidelines, procedures, standards and criteria of ERCOT.

"Events of Default" has the meaning given such term in Section 6.1

"Expected Installed Capacity" means 200.1 MW.

"Force Majeure" means causes or events beyond the reasonable control of the Party claiming Force Majeure, and which (i) could not be reasonably anticipated (ii) could not be avoided or removed by such Party's use of Commercially Reasonable efforts and (iii) were not caused by the fault or negligence of the Party claiming Force Majeure including, without limitation, acts of God; sudden actions of the elements such as floods, earthquakes, hurricanes, tornadoes, wind speeds in excess of safe installation or working limits of the turbines; high winds of sufficient strength or duration to materially damage the Facility or significantly impair its construction or operation, sabotage; vandalism beyond that which could reasonably be prevented by the Party claiming the Force Majeure; terrorism; war; riots; fire; explosion; hot or cold temperatures outside the turbine rating parameters as stated in the turbine manufacturer's literature; icing conditions on the blades; blockade, insurrection or inability (despite diligent efforts) to obtain or maintain required licenses, permits, or approvals under the Interconnection Agreement or for the construction and operation of the Project under the terms of this Agreement ; civil disturbance or strike or other labor difficulty caused or suffered by a Party or any third Person beyond the reasonable control of such Party  (even if such difficulties could be resolved by conceding to the demands of a labor group)  curtailment or suspension of transmission or directives from the Transmission Provider to curtail or suspend deliveries; provided that such curtailment or suspension of transmission is not caused by any action or inaction of Buyer; a disconnection or interruption of service under the Interconnection Agreement, provided that such disconnection or suspension is not caused by Seller's default under the Interconnection Agreement, or any restraint or restriction imposed by Law or any directive from a Governmental Entity. Force Majeure cannot be claimed based on (i) the loss of Buyer's markets; (ii) Buyer's inability economically to use or resell Test Energy or Net Electricity; (iii) Buyer's failure to purchase any congestion rights, Transmission System rights, or other such Transmission System products needed to schedule Test Energy or Net Electricity; or (iv) Seller's ability to sell the Product for more than the Contract Price.

"Forced Outage" means an unexpected failure of one or more components of the Project or any outage on the Transmission System that prevents Seller from making Net Electricity available at the Delivery Point and is not the result of Force Majeure.

"Gains "means, with respect to a Non-Defaulting Party, an amount equal to the present value of the economic benefit to it, if any (exclusive of Costs), resulting from the termination of this Agreement, determined in a commercially reasonable manner.  For the avoidance of doubt, Gains shall be measured with respect to the Projected Generated Energy over the remainder of the Term (irrespective of any early termination of this Agreement).

"Governmental Entity" means  the national government, any political subdivision of the national government or any state, county or local jurisdiction therein or any other governmental, regulatory, quasi-governmental, independent system operator, including ERCOT, board, commission, department, division, organ, instrumentality, court or agency of any thereof or entity with authority to bind a Party at law.

5

"Good Utility Practice" means any of the practices, methods, and acts that would be implemented and followed by a prudent operator of wind generating facilities similar to the Project in Texas  during the relevant time period, or any of the practices, methods, and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety, and expedition.  Good Utility Practice is not intended to be limited to the optimum practice, method, or act, to the exclusion of all others, but rather is intended to include acceptable practices, methods, and acts generally accepted in the industry.

"Indemnified Party" has the meaning given to such term in Section 9.2(a).

"Indemnifying Party" has the meaning given to such term in Section 9.2(a).

"Initial Delivery Date" means the date the first of the Project's Turbines generates and delivers Net Electricity to the Delivery Point.

"Interconnection Agreement"  means the interconnection agreement between Seller and Transmission System Owner that contains the rights and obligations of those Parties with respect to the interconnection of the Project with the Transmission System as required by the ERCOT Protocols, and prescribing the methods and procedures to be used for the safe operation and maintenance of the Project Interconnection Facilities.

"Interconnection Facilities" means all the facilities installed for the purpose of interconnecting the Project to the Delivery Point, including, but not limited to all transformers and associated equipment, relay, switching, metering, Supervisory Control and Data Acquisition (SCADA) communications and safety equipment.

"Interest Rate" means, on any date, the per annum rate of interest equal to the prime lending rate as may from time to time be published in The Wall Street Journal under "Money Rates," plus two percent (2%) provided, that the Interest Rate shall never exceed the maximum rate permitted by applicable Law.

"Law" means, without limitation, all applicable national, state, local or municipal laws statutes, codes, acts,  treaties, judgments, decrees, injunctions, writs and orders of any court, or Governmental Entity and rules, regulations, orders, ordinances, licenses, permits directives and requirements of any Governmental Entity.

"LCRA SPP" means the marginal clearing price of energy published by ERCOT for the LCRA NOIE Load Zone in Real Time, or the load zone in which the majority of the load served by LCRA is located if the LCRA NOIE Load Zone ceases to exist during the Term of this Agreement.

"Letter(s) of Credit" means one or more irrevocable, transferable standby letters of credit issued by a U.S. commercial bank or a foreign bank with a U.S. branch with such bank having a credit rating of at least A+ from S&P or A1 from Moody's, in a form acceptable to the Party in whose favor the letter of credit is issued.  Costs of a Letter of Credit shall be borne by the applicant for such Letter of Credit.

"Liabilities" has the meaning given to such term in Section 9.2(a).

"Losses" means, with respect to a Non-Defaulting Party, an amount equal to the present value of the economic loss to it, if any (exclusive of Costs), resulting from termination of this Agreement, determined in a commercially reasonable manner.  For the avoidance of doubt, Losses shall be measured with respect to the Projected Generated Energy over the remainder of the Term (irrespective of any early termination of this Agreement).

"LOA" has the meaning given to such term in Section 10.2

"Maintenance Outage" means the partial or complete removal of the    Project from service to perform work on specific components, at a time when the Project    must be removed from service before the next Planned Outage in the interest of safety or the prevention of injury or undue wear and tear on the Project or any component thereof.

"Material Credit Event" means an event that results in Buyer or Seller, as applicable, failing to meet the Credit Requirements applicable to each.

"Minimum Output Liquidated Damages" has the meaning given to such term in Section 3.5.

"Month" means one calendar month.

"Monthly Average LCRA SPP" means the sum of the LCRA SPP for all Settlement Intervals in each   Month of a Calendar Year divided by the number of Settlement Intervals in the same Month .

"Monthly Minimum Contract Amount" means the amount shown on Exhibit C for a given Month, prorated for the portion of each Month during which Seller fails to deliver the Net Electricity or Buyer fails to accept the Net Electricity, if applicable, for purposes of determining the monthly minimum contract amounts for consecutive sixty (60) Days under Sections 4.2 or 4.3.

"Moody's" means Moody's Investor Services, Inc. and any successor thereto.

 "MW" means megawatt.

"MWh" means megawatt hour.

"NERC" means the North American Electric Reliability Corporation or its successor.

"Net Electricity" means, at any time, all of the electric energy generated by the Project by means of wind generation and  delivered to the Delivery Point as measured by the EPS meters, other than Test Electricity, energy used in the operation of the Project and electrical losses incurred up to the Delivery Point.

 "Non-Defaulting Party" has the meaning given to such term in Section 6.2.

"Operating Procedures" has the meaning given to such term in Section 3.15.

"Person" means any individual, entity, corporation, general or limited partnership, limited liability company, joint venture, estate, trust, association or Governmental Entity.

"Planned Outage" means the partial or complete removal of the Project from service for scheduled, routine maintenance (e.g., for annual overhaul, inspections or testing), as set forth in Section 3.18(a).

"Posting Party" " has the meaning given to such term in Section 10.3.

"Premises" means that certain real property located in San Patricio County, Texas in the general vicinity of the Pelican Switch Substation in San Patricio County, Texas.

"Price Curtailment" has the meaning given to such term in Section 3.6.

"Product" has the meaning given to such term in Section 3.1.

"Project" has the meaning given such term in the first recital hereto.

"Project Information" has the meaning given to such term in Section 11.1.

"Project's Turbines" means 87 Siemens model 101 2.3 MW wind turbines which number may be reduced by Casualty Events, by the number of Delayed Turbines (subject to the requirements of Section 2.2), or otherwise increased or decreased as agreed by the Parties from time to time.

"Projected Generated Energy" means, for any period following COD, the average of the Contract Year Actual Metered Output of the Project, expressed in MWh, for all previous Contract Years multiplied by the number of Contract Years in the remaining Term, prorated as necessary. In the event that less than two (2) Contract Years have occurred, Projected Generated Energy shall equal the monthly average for all Months after the COD, multiplied by the number of Months in the remaining Term, prorated as necessary.

"PUCT" means Public Utility Commission of Texas or its successor.

"Quarter" means three (3) calendar Months.

"QSE" means Qualified Scheduling Entity as such term is defined in the ERCOT Protocols.

"Ratings Threshold" means, with respect to any Person or such Person's guarantor, that such Person or such Person's guarantor has a long-term credit rating (corporate or long-term senior unsecured debt) of (a) either (1) "Baa3" or higher by Moody's or (2) "BBB-" or higher by S&P, or (b) if rated by both Moody's and S&P, both (a)(1) and (a)(2).

"REC(s)" means a tradable instrument that represents all of the environmental attributes associated with one (1) MWh of energy production from a certified renewable generator as defined in the Texas Administrative Code Title 16, Section 25.173(c) (13) and the ERCOT Protocols Section 14.3.2 and does not include the electric energy associated with such RECs.

"Regulatory Event" has the meaning given to such term in Section 14.6.

"Replacement Price" means the price (in $/MWh) at which Buyer, using Commercially Reasonable Efforts, purchases a replacement for any part of the Product not made available by Seller pursuant to the requirements hereof, plus additional transmission congestion charges, if any, reasonably incurred by Buyer in taking such replacement from third party sellers, or absent a purchase, the market price for such replacement as determined by Buyer in a commercially reasonable manner.

"Representatives" has the meaning given to such term in Section 11.2.

"S&P" means Standard & Poor's Rating Group (a division of McGraw-Hill, Inc.) and any successor thereto.

"Sales Price" means the price (in $/MWh) at which Seller, using Commercially Reasonable Efforts, resells any part of the Product not taken by Buyer, deducting from such proceeds any additional transmission congestion charges, if any, reasonably incurred by Seller in marking available such part of the Product to third party purchasers.

"Scheduled Commercial Operation Date" means December 31, 2010.

"Seller's Guaranty" has the meaning given to such term in Section 10.2

"South Zone MCPE" means the Balancing Energy Market Clearing Price published by ERCOT at http://www.ercot.com for each Settlement Interval under the heading "Monitor the Market: Historical: Balancing Energy (YYYY-MM) Balancing Energy Services Daily reports: MCPE Results: Price:S  or any successor headings or publication, that report prices for balancing energy in the South Zone effective on the relevant pricing date.

"Term" has the meaning given to such term in Section 2.1.

"Termination Payment" has the meaning given to such term in Section 6.3.

"Test Electricity" means all of the electric energy (including all associated RECs and other environmental Credits) generated by  the Project  as a result of the (i) initial commissioning of any wind turbine, or (ii) testing of any wind turbine.

"TRE" means the Texas Reliability Entity or its successor in function.

 "Transmission System" means the electric transmission system to which the Project is connected.

"Transmission System Owner" means the entity that owns the Transmission System to which the Project is connected.

"Turbine Limitations" has the meaning given to such term in Section 3.6.

"Weighted Monthly Average LCRA SPP" means the product of Monthly Average LCRA SPP times x (where x equals the percentage of Net Electricity generated each Month by the Project

9

assuming the total Net Electricity generated in a  Calendar Year by the Project is the sum of all Net Electricity generated in all Months of the Calendar Year).

"Zonal Market" means the market structure as defined by the ERCOT Protocols as of the Effective Date, and as may be amended prior to the implementation of a Nodal Market.

## ARTICLE 2

## TERM

**2.1     Term.**   The term hereof shall begin on the Effective Date and shall, unless sooner terminated as provided herein, end on the eighteenth   (18th) anniversary of the Commercial Operation Date (the "Term");

**2.2     Project Achievement of Commercial Operation.** Seller shall work diligently   to achieve the Commercial Operation Date no later than the Scheduled Commercial Operation Date, subject to the extensions provided herein. Seller shall notify Buyer in writing (through an officer's certificate or a certificate of an independent engineer) no less than three (3) Business Days prior to the anticipated Commercial Operation Date when the Commercial Operation Date will be achieved and the number of the Project's Turbines that will achieve Commercial Operation.    Nothing herein shall limit Seller's right or ability to declare the Commercial Operation Date prior to the Scheduled COD if all requirements thereof are satisfied prior to the Scheduled COD. Commencing on the Effective Date, Seller shall keep Buyer informed on the progress of the Project, and shall provide quarterly reports describing the status of permits, agreements, major equipment purchases and deliveries, substations and interconnection facilities associated with the Project.

**2.3     Seller Buy Down.** If Seller has achieved Commercial Operation with respect to seventy-five percent (75%) or more of the Project's Turbines, but less than one hundred percent (100%) of the Project's Expected Installed Capacity has been completed by Seller on June 1, 2011, then Seller shall notify Buyer in writing that the Project's Expected  Installed Capacity will be reduced to the actual  Project's installed capacity as of that date.

In such event, Seller shall pay Buyer (the "Buy Down Payment") an amount equal to the positive difference between the product of (A) $500,000 multiplied by (B) the positive difference between (x)  200.1 MW minus (y)  the Project's installed capacity as of June 1 ,2011.

Upon Seller's payment of the Buy Down Payment, the Contract Year Expected Metered Output shall be reduced pro rata based upon the Project's installed capacity as of June 1, 2011. If, after making such Buy Down Payment, Seller subsequently installs additional turbines at the Project site, Seller shall be entitled to sell the output of all Products delivered from such turbines to any third party free of any claims by Buyer, provided that such additional turbines are separately metered from the Project's Turbines.

## ARTICLE 3

## PURCHASE OF ENERGY BY BUYER

**3.1 Sale and Purchase Obligations**.  In accordance with and subject to the provisions of this Agreement, commencing on the Commercial Operation Date and continuing through the end of the Term, Seller shall sell and deliver, or cause to be delivered, and Buyer shall purchase and receive, or cause to be received, all of the Project's capacity, Net Electricity, Ancillary Services and environmental Credits, including RECs associated with the Net Electricity generated by the Project (collectively the "Product"). Seller shall not be required to incur any additional costs or be required to make any capital improvements for future additional ancillary services that may be requested by Buyer and are not mandated to be provided by ERCOT.
Buyer shall also receive and purchase all Test Electricity delivered by Seller to Buyer at the Delivery Point.

**3.2 Deliveries**.  Delivery of all Test Energy and Net Electricity sold and purchased hereunder shall be made at the Delivery Point.   All deliveries and scheduling of  Test Energy and Net Electricity to Buyer  are subject to the scheduling, dispatch, transmission and other directives and procedures of ERCOT and the ERCOT Protocols.

**3.3 Contract Price.** Except as provided in Section 3.6, throughout the Term, Buyer shall pay to Seller $ 64.75 for each MWh delivered by Seller to Buyer at the Delivery Point (the "Contract Price"). Buyer shall pay Seller for each MWh of Test Electricity delivered by Seller at the Delivery Point a price equal to the product of the Contract Price times eighty-five percent (85%).

**3.4  Regulatory Change applicable to RECs.** Notwithstanding any other provision of this Agreement to the contrary, the elimination, reduction, or change in the nature or legal characteristics (including with respect to tradability or transferability) of RECs as a result of regulatory changes shall not relieve Buyer of its obligations to purchase the Product at the Contract Price hereunder.

**3.5 Minimum Metered Output**. No later than the thirtieth (30th) Day following the last Day of a Contract Year, Seller shall provide to Buyer a calculation of that Contract Year  Actual Metered Output.

If the Contract Year Actual Metered Output for a Contract Year is less than the applicable Contract Year Minimum Metered Output, then Seller shall make a payment to Buyer, as liquidated damages, (the "Minimum Output Liquidated Damages") no later than the sixtieth (60th) Day following the last Day of such Contract Year in an amount equal to the product of the Annual Average LCRA SPP times the difference between the Contract Year Actual Metered Output and the Contract Year Minimum Metered Output as follows:

(Contract Year Minimum Metered Output – the Contract Year Actual Metered Output) times the Annual Average LCRA SPP.   For the avoidance of doubt, Exhibit C provides for a sample calculation in accordance with this formula

11

If during any Contract Year, Seller paid Buyer liquidated damages under Section 4.2 Seller shall have the right to offset those liquidated damages against the payment of the Minimum Output Liquidated Damages, if any. Once Seller makes the payment hereunder to Buyer, no Event of Default shall be deemed to have occurred and Seller shall have no further liability to Buyer.

**3.6 Price Curtailment.**  Buyer shall not be obligated to purchase nor be deemed to have purchased the Product  during any ERCOT Settlement Interval in which the South Zone MCPE (if a Zonal Market is in effect) or the LMP for the Resource Node (if a Nodal Market Design is implemented by ERCOT during the Term) settles at or below $1.00/MWh. ("the Price Curtailment") If Buyer wishes to curtail deliveries hereunder at any other time during the Term and Seller agrees to implement such curtailment request, in that event, Buyer shall pay Seller the product of the Contract Price and the Deemed Generated Energy for such period.

The foregoing notwithstanding, nothing herein shall require Seller to physically ramp down  the Project's Turbines to satisfy the Price Curtailment.  For the avoidance of doubt, if Seller elects to generate Net Electricity and/or RECs in spite of a Price Curtailment and, if not otherwise excused hereunder, then Seller shall be liable for all payments due to ERCOT resulting from such election and Buyer shall have no liability hereunder. If, however, Seller elects to cause the number of the Project's Turbines necessary to effect the Price Curtailment to be out-of-service or curtailed, Seller shall implement such curtailment subject to the Turbine Limitations and in accordance with the dispatch timelines described in the ERCOT Protocols.

Unless excused hereunder, the failure of Seller to comply with the provisions of this Section 3.6 shall render Seller liable for actual direct damages suffered by Buyer as a result of such failure, but shall not be an Event of Default.

**3.7   ERCOT-Directed Curtailment.**   If ERCOT or any other successor entity issues an instruction for the Project to curtail generation (the "ERCOT- Directed Curtailment") then Seller shall comply with such instruction provided, that such compliance shall not result in a violation of the Turbine Limitations. Neither Buyer nor Seller shall be entitled to claim damages with respect to electric energy not generated and sold resulting from such ERCOT-Directed Curtailment.

**3.8   Reductions in Delivery.**

**(a) Project Maintenance.**  Seller shall be permitted to reduce deliveries of the Product during any period of Maintenance or Planned Outage without liability to Seller except as provided in Section 3.5. Except in cases of emergency or as may otherwise be required to protect  the Project, ensure the safety of Project personnel, or as required by the Project Turbine manufacturer, Seller shall provide Buyer advance  notice as reasonable under the circumstances of  the Project's Maintenance Outage. Seller shall (i) use Commercially Reasonable Efforts to minimize outages of  the Project, and all  Maintenance and Planned Outage schedules and procedures shall be developed and conducted taking into account Good Utility Practice.

**(b) Forced Outage.**  Seller shall be permitted to reduce deliveries of the Product during any Forced Outage without liability to Seller except as provided in Section 3.5.  Seller shall provide Buyer with prompt notice and expected duration (if known) of any Forced Outage.

**(c) Emergency and Other Interconnection Events**.   Seller shall be permitted to reduce deliveries of the Product during any period of an Emergency Condition or upon notice by the Transmission Provider pursuant to the terms of the Interconnection Agreement or an applicable tariff without liability to Seller except as provided in Section 3.5.

**3.9   Casualty Events**. In the event that any of the Project's Turbines suffers a total casualty loss, ("the Casualty Event") Seller will notify Buyer in writing, as soon as practical , of its election to either (i) use insurance proceeds, if any, to replace the Project's Turbine(s) that suffered the Casualty Event, (ii) pay Buyer an amount equal to $500,000,as liquidated damages, for each Project Turbine that suffered the Casualty Event and has not otherwise been replaced (the "Casualty Buy Down Payment") or (iii) provide capacity, energy and Credits from an alternative generation facility provided such other generation facility has a production profile substantially similar to the Project, and provided further that Seller shall be responsible for any congestion costs incurred by Buyer in excess of those that would have been incurred if the energy had been generated by the Project. In the event, Seller elects to pay Buyer the Casualty Buy Down Payment, the Contract Year Expected Metered Output shall be reduced by the number of megawatts attributable to such Project's Turbine(s). Once Seller complies with one of the elections hereunder, Seller shall be deemed to have satisfied its obligations hereunder and shall have no further liability to Buyer.

**3.10   Rates and Terms Binding**.  The rates, terms and conditions of service specified in this Agreement shall remain in effect from the Effective Date until the expiration of the Term. Notwithstanding any provision in this Agreement, neither Party shall seek, nor shall support any third party in seeking, to prospectively or retroactively revise the rates, terms or conditions of service of this Agreement through application or complaint to the FERC pursuant to the provisions of Sections 205, 206 or 306 of the Federal Power Act, or any other provisions of the Federal Power Act, absent the prior written agreement of the Parties.  Further, absent the prior agreement in writing by both Parties, the standard of review for changes to the rates, terms or conditions of service of this Agreement proposed by a Party, a non-Party or the FERC acting sua sponte shall be the "public interest" standard of review set forth in United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 US 332 (1956) and Federal Power Commission v. Sierra Pacific Power Co., 350 US 348 (1956).

**3.11   Power**.  All  Net Electricity delivered by Seller to the Delivery Point (a) shall be in the form of three-phase alternating current having a nominal frequency of sixty cycles per second and, and (b) shall meet all requirements in the Interconnection Agreement.

**3.12  Costs and Charges**.   Seller shall be responsible for all costs or charges imposed in connection with the delivery of Net Electricity to the Delivery Point including EPS meter design, engineering, purchase, installation and testing.  Buyer shall be responsible for all costs or charges imposed in connection with the Net Electricity at, and on, Buyer's side of the Delivery Point. For the avoidance of doubt, Seller shall be responsible for the cost of Voltage Support Service (VSS including Reactive Control and/or Low Voltage Ride Through) and governor response (required unit response to System Frequency, or Droop Characteristics) as may be required by ERCOT.

**3.13  Title and Risk of Loss**.   As between Buyer and Seller, Seller shall be deemed to be in exclusive control of, and responsible for, any damage or injury caused by, Net Electricity prior to delivery at the Delivery Point and Buyer shall be deemed to be in exclusive control of, and

responsible for, any damages or injury caused by, Net Electricity delivered hereunder at, and after the Delivery Point.  Seller warrants that it will deliver Net Electricity to Buyer under this Article 3 free and clear of all liens, claims and encumbrances arising prior to the time Net Electricity is delivered to the Delivery Point.  Title to and risk of loss of all Net Electricity delivered under this Article 3 shall transfer from Seller to Buyer upon delivery of such Net Electricity to Buyer at the Delivery Point. Title and risk of loss related to environmental Credits, including RECs shall pass and transfer to Seller upon the transfer of such environmental Credits from Seller to Buyer in accordance with the ERCOT Protocols.

**3.14    Standard of Operation**.  Seller shall operate the Project in accordance with (i) the practices, methods, acts, guidelines, standards and criteria of ERCOT, NERC and TRE standards to the extent not inconsistent with the ERCOT Operating Guides and (ii) all applicable Laws. Seller will obtain all certifications, permits, licenses and approvals necessary to construct, operate and maintain the Project and to perform its obligations under this Agreement during the Term.   As between Buyer and Seller, Seller will be responsible for the coordination and synchronization of the Project's equipment with the Transmission System, and shall be solely responsible for any damage that may occur as a direct result of Seller's improper coordination or synchronization of such equipment with the Transmission System.

**3.15   Operating Procedures**.

**(a)**    Seller and Buyer will endeavor to develop written operating procedures (the "Operating Procedures") before the Initial Delivery Date. The Parties agree that the Operating Procedures will set forth the protocol under which the Parties will perform their respective obligations under this Agreement and will include, but will not be limited to, procedures concerning the following: (1) the method of day-to-day communications; (2) key personnel lists for Seller and Buyer; and (3) Maintenance Outage, Forced Outage and Planned Outage reporting.

**(b)**    As a means of securing effective cooperation and interchanges of information and of providing consultation on a prompt and orderly basis between the Parties in connection with various administrative, commercial and technical issues which may arise during the performance of this Agreement, the Operating Procedures will also provide that the Parties will each appoint an authorized representative (with respect to each Party, the "Authorized Representative") and may each appoint an alternate (with respect to each Party, the "Alternate") to act in its Authorized Representative's absence. The Authorized Representatives and Alternates shall be managers well-experienced with regard to matters relating to the implementation of the Parties' rights and obligations under this Agreement with full authority to act for and on behalf of the Parties appointing them.  Each Party will notify the other in writing of its Authorized Representative and Alternate and these appointments will remain in full force and effect until written notice of substitution is delivered to the other Party.

**3.16 Interconnection**.   During the Term, Seller will operate, maintain and control all of Seller's 138 kV Interconnection Facilities located at the Premises up to, and including, the Delivery Point at Seller's sole cost and expense.

**3.17  No Split Metering**

All Net Electricity sold to Buyer under this Agreement shall flow through a single EPS meter, and no electricity sold to any third party shall flow through such EPS meter, except if so required to

14

implement any sales of the Product under any permitted assignment in accordance with Section 8.1.

**3.18   Scheduling**.

**(a)**      Seller or its designated Affiliate shall register as the Resource QSE to schedule and deliver the Test Energy and Net Electricity to Buyer under this Agreement. Buyer or its designee shall be Buyer's QSE to receive the Test Energy and Net Electricity under this Agreement. Each of Buyer's and Seller's responsibilities as  QSE shall be consistent with  the standards outlined by ERCOT for a QSE for the scheduling of power from a renewable resource facility for delivery hereunder, and shall follow the procedures set forth in Schedule A to this Agreement.

**(b)**      At Buyer's request and expense, Seller will procure and install a commercially available wind energy output forecasting service or program that will provide to Buyer next hour and next Day output forecasts, no later than 6:00 a.m. on the Day prior to the Operating Day.  Seller will provide the data necessary to provide such forecasts to Buyer but Seller does not warrant or guarantee the information provided pursuant by such vendor or the forecasting service or program nor shall Seller have any liability for any potential lack of completeness or accuracy of the information provided.

**3.19 Outages**.

**(a)**      Planned Outages.  On or before December 1 of each Contract Year Seller will provide to Buyer a non-binding Planned Outage schedule for the following Contract Year.  To the extent possible, Seller will provide Buyer with reasonable advance notice of any material change in the Planned Outage schedule. Seller shall be excused from providing Net Electricity during any Planned Outage and shall have no liability to Buyer therefor except as provided in Section 3.5.

**(b)**      Maintenance Outages.  If during the Term, Seller needs to schedule a Maintenance Outage of the Project, Seller shall notify Buyer, in advance as practicable under the circumstances, of such proposed Maintenance Outage and the Parties shall plan such outage of capacity to mutually accommodate the reasonable requirements of Seller and service obligations of Buyer; provided, however, Buyer's requirements shall not unduly prejudice the operation and maintenance of the Project.  Notice of a proposed Maintenance Outage shall include the expected start date of the outage, the amount of capacity of the Project that will not be available and the expected completion date of the outage.  Buyer shall promptly respond to such notice and may request reasonable modifications in the schedule for the outage. Subject to its operational and maintenance needs, Seller shall use all reasonable efforts to comply with such a request to reschedule a Maintenance Outage.  Seller shall notify Buyer of any subsequent changes in such capacity not available to Buyer or any subsequent changes in such Maintenance Outage completion date.  As soon as practicable, any such notifications given orally shall be confirmed in writing. Seller shall be excused from providing Net Electricity to Buyer during any Maintenance Outage and shall have no liability to Buyer therefor except as provided in Section 3.5.

**(c)**      Forced Outages.  Seller shall promptly provide to Buyer an oral report of any Forced Outage of the Project which report shall include the amount of the capacity of the Project that will not be available because of such Forced Outage and the expected return date of such capacity, and shall update such report as necessary to advise Buyer of changed circumstances.

As soon as practicable, all such oral reports shall be confirmed in writing. Seller shall be excused from providing Net Electricity to Buyer during any Forced Outage and shall have no liability to Buyer therefor except as provided in <u>Section 3.5</u>.

**3.20  <u>Metering, SCADA and Communication Systems</u>**.  Seller shall be responsible for planning, constructing, and paying for the procurement, construction, installation, operation, calibration and maintenance of the SCADA and communication devices located at or near the Delivery Point pursuant to the ERCOT Protocols, ERCOT Operating Guides and  the signed Interconnection Agreement (collectively, the "<u>Communication Equipment</u>"). Seller shall provide a copy of the executed Interconnection Agreement to Buyer.

As necessary for purposes of scheduling delivery of the Net Electricity from the Delivery Point, Seller shall supply all facilities to allow Buyer to read the EPS Meter (dial up interface) from a remote location.  Seller shall (i) read the EPS meter values  in  real time as permitted by the ICA and the Transmission System Owner  and supply the real time data to Buyer in real time. Meteorological parameters of wind speed, wind direction barometric pressure, temperature, will be provided to Buyer from site meteorological tower(s).

Details of communication interfaces will be determined by the Parties. If, however, a private communication network is used (frame relay, etc) Seller shall procure and maintain the endpoints (router or frame relay terminating device) of the communications link, and pay the monthly charges.  If a public communication network is used (internet), Seller shall procure and maintain the endpoints of the communication link. Seller will extend Seller's communication network to Buyer's primary and back-up facilities and provide Ethernet or Serial handofs.  If Buyer wishes to extend Buyer's network to Seller's facility, Buyer shall procure and maintain endpoints and a communications circuit.  If Buyer requires a special circuit type (digital or analog), Buyer shall procure, maintain, and pay for such circuit.  Seller will fully support and implement real time interface, including support of power, rack space and installation support. Seller shall provide Buyer with reasonable advance notice of any EPS Meter inspections or tests to be conducted by the Transmission System Owner, and permit a representative of Buyer to witness and verify, inspections and tests, <u>provided</u>, <u>however</u>, that Buyer shall not unreasonably interfere with or disrupt such inspections or tests or any other activities of Seller and shall comply with all of Seller's safety standards. Upon request by Buyer, and at Buyer's sole expense, Seller will request the Transmission System Owner to perform additional inspections or tests of the EPS meters and will permit a qualified representative of Buyer to witness such testing. Seller shall provide access to Buyer to poll the MV-90 data of the EPS Meter.

Each of Buyer and Seller may, at their own expense, install and maintain additional metering, and/or Communication Equipment for purposes of monitoring, recording or transmitting data relating to the purchase and sale of Net Electricity from the Project. (the "<u>Back-Up Meter</u>") Seller may install a revenue grade meter on the Premises to measure the output of the Project. Each Party will provide the other with reasonable advance notice of, and will permit a representative of the other to witness and verify any inspections or tests, provided, however, that each Party will not unreasonably interfere with such testing.  Upon Buyer's reasonable request, Seller will arrange for a location at the Delivery Point for such additional Buyer equipment.   Seller shall provide shelf or rack space for Buyer's metering, and/or Communications Equipment, adjacent to the Seller's metering, and/or Communications Equipment.   Seller shall provide a 120 VAC, 4-receptacle box with an uninterruptible power supply feed for Buyer's metering, and/or Communications Equipment.   Seller shall begin

coordinating with Buyer on metering, SCADA, and communications interfaces no later than fourteen (14) Days after execution of the Agreement.

If any EPS Meter or Back-up Meter is found to be defective or inaccurate, Seller shall (i),in the case of a Back-Up Meter repair, replace or recalibrate such EPS Meter or (ii) in the case of the EPS Meter, use Commercially Reasonable Efforts to cause Transmission System Owner. to repair, replace or recalibrate such EPS Meter , to eliminate such inaccuracies as provided in the Interconnection Agreement at the expense of the Party that owns the defective or inaccurate equipment. If an EPS Meter or Back-up Meter fails to register or the measurement made is found, upon testing, to be inaccurate by more than one percent (1%) from the measurement made by the standard meter used in the test, an adjustment shall be made correcting all measurements by the inaccurate or defective equipment for both the amount of the inaccuracy and the period of the inaccuracy, as follows:

(a) If the EPS Meter is found to be defective or inaccurate, the Parties shall use a Back-Up Meter, if any, to determine the inaccuracy; provided, however, that the Back-Up Meter has been tested and maintained in accordance with the provisions hereunder. If both Parties have installed a Back-Up Meter and the Back-Up Meter of both Parties is inaccurate by not more than one percent (1%) from the measurement made by the standard meter used in the test, the readings from the Back-Up Meter whose readings most closely conform with the measurements made by the standard meter shall be used. If the Back-Up Meter is found to be inaccurate by more than one percent (1%) from the measurements made by the standard meter used in the test, the Parties shall estimate the necessary adjustment based on the deliveries of Net Electricity from the Project during periods of similar operating conditions when the Back-up Meter was operating properly.

(b) If the Parties cannot agree on the actual period during which the inaccurate measurements were made, the period when an adjustment shall be made shall be the shorter of (i) the last one-half of the period beginning with the last test of the Back-Up Meter and ending on the date of the test when the Back-Up Meter was found to be defective or (ii) the one hundred and eighty (180) Days immediately preceding the test that found the Back-Up Meter to be defective or inaccurate.

**3.21** **Credits**. Seller shall sell to Buyer hereunder the Credits associated with the Net Electricity generated by the Project beginning on the first date when Test Electricity is delivered to Buyer hereunder consistent with the provisions in this Section. Buyer and Seller shall take such actions as are required by ERCOT, including each establishing and maintaining a REC Account with ERCOT, so that Seller may transfer such Credits to Buyer for the Term of this Agreement. Seller shall submit to ERCOT a request for transfer of the applicable RECs for the Quarter from Seller's REC Account to Buyer's REC Account no later than thirty (30) Days after ERCOT has credited Seller's REC Account with the RECs associated with the Net Electricity of the Project produced in the relevant Quarter.

Seller shall have no liability to Buyer regarding potential delays each Quarter in respect to the transfer of RECs from Seller's REC Account to Buyer's REC Account caused by ERCOT's or Buyer's actions or inactions.

**3.22 <u>Taxes</u>.**  Seller shall pay all existing and any new sales, use, excise, ad valorem, and any other similar taxes, imposed or levied by any Governmental Entity on Net Electricity sold and delivered hereunder up to the Delivery Point.  Buyer shall pay for all existing and any new sales, use, excise, ad valorem, and any other similar taxes, imposed or levied by any Governmental Entity on the Net Electricity sold and delivered hereunder at and after the Delivery Point. To the extent permitted by applicable  Law, each Party shall indemnify, release, defend and hold harmless the other Party from and against any and all liability for taxes imposed or assessed by any Governmental Entity with respect to the  Net Electricity sold, delivered and received hereunder that are the responsibility of the first Party pursuant to this <u>Section 3.22</u>.

# ARTICLE 4

## <u>FAILURE TO ACCEPT OR TO DELIVER PRODUCT</u>

**4.1 <u>Excuse of Seller's Obligations</u>.**  Notwithstanding anything to the contrary in this Agreement, Seller shall have no obligation to make any part of the Product available to Buyer for any period (and shall have no liability hereunder) (a) in which Buyer fails to take any part of the Product from Seller, (b) in which Seller's obligation to make the Product  available is excused pursuant to <u>Sections 3.6</u>, <u>3.7</u> or <u>3.19</u>   (c) in which Seller's obligation to make the Product available is suspended pursuant to <u>Section 6.2</u> or (d) in which either Party's obligations are suspended due to Force Majeure.

**4.2 <u>Liquidated Damages Due to Seller's Failure to Deliver</u>** As Buyer's exclusive remedy hereunder  if (a) Seller fails to make available at the Delivery Point all or part of the  Net Electricity or otherwise fails to make available the Product and such failure is not excused pursuant to the terms of this Agreement, (b) Buyer is unable to receive the Product  due to any act or failure to act by Seller that is not excused hereunder  or (c) Buyer suspends performance due to a Seller Event of Default, then Seller shall pay Buyer within five (5) Business Days of invoice receipt, an amount equal to the product of (i) the positive difference, if any, obtained by subtracting the Contract Price from the Replacement Price (ii) multiplied by the sum of the Net Electricity not made available to Buyer plus any Deemed Generated Energy during the time period of such failure or suspension, plus costs reasonably incurred by Buyer; provided, however, that any payments made under this provision are not intended to change Seller's rights and obligations as provided in <u>Section 3.5</u>, if applicable, and provided further that if Seller fails to make available to Buyer fifty percent (50%) or more of the applicable Monthly Minimum Contract Amounts for a consecutive period of sixty (60) Days, all remedies in <u>Section 6.2</u> shall be available to Buyer.  The invoice for the amounts payable hereunder shall include a written statement explaining in reasonable detail the calculation of such amount.

**4.3 <u>Liquidated Damages Due to Buyer's Failure to Take</u>.**  As Seller's exclusive remedy hereunder if (a) Buyer fails to take any of  Net Electricity at the Delivery Point and such failure to take is not excused pursuant to the terms of this Agreement, (b) Seller is unable to generate Net Electricity due to any act or failure to act by Buyer that is not excused hereunder (including any scheduling behavior of Buyer), or (c) Seller suspends performance due to a Buyer Event of Default, then Buyer shall pay Seller, within five (5) Business Days of invoice receipt, an amount equal to the product of (a) the positive difference, if any, obtained by subtracting (x) the Sales Price from (y) the Contract Price, multiplied by (b) the sum of  Net Electricity  and any Deemed Generated Energy during the time period of such failure or suspension, plus costs reasonably incurred by Seller ; provided, however, that any payments made under this provision are not

intended to change Buyer's rights and obligations as provided in <u>Section 3.5</u>, if applicable, and provided further that if Seller fails to make available to Buyer fifty percent (50%) or more of the applicable Monthly Minimum Contract Amounts for a consecutive period of sixty (60) Days, all remedies in <u>Section 6.2</u> shall be available to Seller.  The invoice for the amounts payable hereunder shall include a written statement explaining in reasonable detail the calculation of such amount.

**4.4 <u>Deemed Generated Energy</u>**.  Calculations of Deemed Generated Energy for any period required under this Agreement shall be made by Seller and approved by Buyer, with each Party acting reasonably and in good faith, and shall be determined by taking into account (a) during such period, the actual fifteen (15) minute (or more frequent) wind speeds (interpolated over time intervals, if necessary) measured by wind monitoring equipment located at the Project site available for operation immediately prior to the commencement of the period in question, or, if such monitoring equipment is unavailable during a relevant interval, then using other available data or interpolated data determined using Good Utility Practices; and (b) the power curve provided by the Project's Turbine manufacturer (adjusted by historical data for  the Project compiled by Seller, if any), as applied to the wind speeds referred to in clause (a), as adjusted for line losses to the Delivery Point using historical data compiled by Seller, if any.  Seller shall provide Buyer with supporting documentation detailing the basis for its calculation of Deemed Generated Energy.  Any disputes regarding such calculation shall be resolved in accordance with <u>Article 13.</u>

## ARTICLE 5

## <u>REPRESENTATIONS AND WARRANTIES</u>

**5.1 <u>Representations and Warranties</u>**.   As a material inducement to execution of this Agreement, as of the Effective Date, each Party hereby represents and warrants to the other Party that:

**(a)**It is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, and is qualified to conduct its business in all jurisdictions necessary to perform its obligations hereunder;

**(b)**The execution, delivery and performance of this Agreement are within its powers, have been duly authorized by all necessary action and do not conflict with or violate any of the terms or conditions in its governing documents or any agreement to which it is a Party, or any law, rule, regulation, order, writ, judgment, decree or other legal or regulatory determination applicable to such Party;

**(c)**This Agreement constitutes a legal, valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as limited by bankruptcy, insolvency, reorganization and other laws affecting creditor's rights generally, or by the exercise of judicial discretion in accordance with general principles of equity;

**(d)**There is no Bankruptcy Proceeding pending or being contemplated by it, or to its knowledge threatened against it;

**(e)** To such Party's knowledge, there are no actions, proceedings, judgments, rulings or orders, issued by or pending before any court or other governmental body that would materially adversely affect its ability to perform this Agreement; and

**(f)** No consent, approval or authorization of, or registration, filing or declaration with, any federal or state governmental authority or other regulatory agency or any other Person, which has not been received, waived or satisfied as of the date hereof, is required for the valid execution and delivery of this Agreement, the consummation of the transactions contemplated hereby or compliance with the terms and provisions hereof.

**5.2  Buyer's Representations and Warranties** Buyer represents and warrants to Seller, as of the Effective Date, that it has the financial resources and capability to satisfy its obligations under this Agreement.

**5.3.  Other Representations and Warranties.** NEITHER PARTY   MAKES ANY WRITTEN OR ORAL REPRESENTATION, WARRANTY, OR COVENANT EITHER EXPRESS OR IMPLIED, REGARDING THE CURRENT OR FUTURE EXISTENCE OF ANY ENVIRONMENTAL CREDITS OR ANY LAW GOVERNING THE EXISTENCE OF ANY ENVIRONMENTAL CREDITS UNDER THIS AGREEMENT OR OTHERWISE OR THEIR CHARACTERIZATION OR TREATMENT UNDER APPLICABLE LAW OR OTHERWISE.

OTHER THAN THOSE WARRANTIES AND GUARANTIES EXPRESSLY SET FORTH IN THE TERMS OF THIS AGREEMENT, NEITHER PARTY MAKES ANY WARRANTIES AND GUARANTIES OF ANY KIND WHATSOEVER, EXPRESS, IMPLIED, ORAL, WRITTEN OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR WARRANTIES ARISING BY CUSTOM, TRADE USAGE, PROMISE, EXAMPLE OR DESCRIPTION, ALL OF WHICH WARRANTIES AND GUARANTIES ARE EXPRESSLY DISCLAIMED AND WAIVED BY EACH PARTY.

**5.4 No Other Representations and Warranties.**   Each Party acknowledges that it has entered into this Agreement in reliance only upon the representations and warranties set forth in this Agreement.

## ARTICLE 6

### EVENTS OF DEFAULT AND REMEDIES; TERMINATION

**6.1   Events of Default.**   The following occurrences shall constitute events of default (the "Events of Default"):

**(a)** Failure by a Party to make any payment required hereunder when due if such failure is not remedied within three (3) Business Days after notice of such failure, provided, that such payment is not the subject of a good faith dispute pursuant to Section 7.3.

**(b)** Failure by a Party to perform any other material obligation hereunder, and such failure is not remedied within thirty (30) Days after receipt by the defaulting Party of written notice of

such failure, provided that so long as a Party has initiated and is diligently attempting to effect a cure, the Party's cure period shall extend for an additional sixty (60) Days;

**(c)** Any representation or warranty made by a Party pursuant to Article 5 shall have been false in any material respect when made, and is not remedied within thirty (30) Days after receipt by the defaulting Party of written notice of such failure, provided that so long as a Party has initiated and is diligently attempting to effect a cure, the Party's cure period shall extend for an additional sixty (60) Days; or

**(d)** A Party is subject to a Bankruptcy Proceeding,

**(e)** A Material Credit Event occurs with respect to Buyer or Seller, as applicable, and such failure is not cured within three (3) Business Days therof.

**6.2    Default Remedies**.  If an Event of Default with respect to a defaulting Party has occurred and is continuing, the other Party (the "Non-Defaulting Party") shall have the right, without duplication of recovery, to:

> **(a)** suspend performance of its obligations under this Agreement, and, in the case of Seller, sell to a third Person, free and clear of any claims by Buyer, the Product for such period during which Seller suspends performance hereunder;

> **(b)** withhold any payments due to the defaulting Party under this Agreement ;

> **(c)** designate a Day, no earlier than the Day such notice is effective and no later than twenty (20) Days after such notice is effective, as an early termination date (the "Early Termination Date") to accelerate all amounts then owing between the Parties and to liquidate and terminate this Agreement.  The Non-Defaulting Party shall calculate, in a commercially reasonable manner, the Termination Payment as of the Early Termination Date; and/or

> **(d)** exercise all remedies provided in this Agreement or that may be available at law or in equity if otherwise permitted under this Agreement.

**6.3   Termination Upon an Event of Default**.  As soon as practicable after the declaration of an Early Termination Date, notice shall be given by the Non-Defaulting Party to the defaulting Party of the amount of the Termination Payment, if any, due to the Non-Defaulting Party.  The notice shall include a written statement explaining in reasonable detail the calculation of such amount.  The Termination Payment, if any, shall be made by the defaulting Party within five (5) Business Days after such notice is effective and shall bear interest at the Interest Rate from the due date until paid.   Any disputes regarding a Termination Payment shall be settled in accordance with Article 13.

The "Termination Payment" means, with respect to the Non-Defaulting Party, as applicable, either (i) the sum of Losses plus Costs or (ii) the positive difference between Costs minus Gains, expressed in U.S. Dollars.  If the Termination Payment calculation does not demonstrate that the Non-Defaulting Party suffered a net loss, the Termination Payment shall be zero.  If the

Termination Payment calculation demonstrates that the Non-Defaulting Party suffered a net loss, the Termination Payment shall be due to the Non-Defaulting Party pursuant to this Section 6.3.

When calculating "Gains" and "Losses", the Non-Defaulting Party shall take into account, to the extent available, the average of prices quoted by three (3) independent third-party brokerage services having experience in energy contracts selected by the Non-Defaulting Party, settlement prices on established, actively traded power exchanges and other bona fide third party offers, and other relevant market information.

## ARTICLE 7

### BILLING AND PAYMENT; RECORDS

**7.1 Billing and Payment.**  While a Zonal Market is in effect during the Term, Seller shall sell Test Energy and Net Electricity to ERCOT.  Seller shall invoice Buyer at the Contract Price (or 85% of the Contract Price for Test Energy) less the South Zone MCPE for such energy. If a Zonal Market is still in effect after January 1, 2012, Seller and Buyer agree to negotiate in good faith a different zonal scheduling and settlement methodology. Each  Month during the Term in which the Texas Nodal Market is in effect, Seller shall send to Buyer a statement setting forth the quantity of  the Project's Net Electricity that was delivered to the Delivery Point in the immediately preceding Month based on  ERCOT's settlement data (or, if unavailable, the Back-up Meter), the total amount due for  the Project's Net Electricity delivered to Buyer during the immediately preceding Month (which amount shall be the product of the  Net Electricity delivered to the Delivery Point and the Contract Price), and any other amounts due to Seller or to Buyer under Article 3 of this Agreement.   All statements shall be sent by Seller to Buyer within the first ten (10) Business Days of the Month following the immediately preceding Month. No later than twenty (20) Days after the date such statement is received, or if such Day is not a Business Day, the immediately following Business Day, Buyer shall remit to Seller, by  wire transfer in accordance with Article 12 the amount due pursuant to such statement.   ERCOT resettlements shall be billed and paid in the Month following the resettlement. Seller shall credit Buyer any amounts owed by Seller to Buyer as a result of any resettlement in Seller's next regular monthly statement.

**7.2 Interest on Late Payments.**  Undisputed amounts not paid when due shall accrue interest from, and including, the due date to, and excluding, the date of payment at the Interest Rate.

**7.3  Disputed Amounts.**  If either Party, in good faith, disputes any amount due pursuant to a statement rendered hereunder, such Party shall notify the other Party of the specific basis for the dispute and shall pay that portion of the statement that is undisputed, on or before the due date.  Such notice shall be provided within twenty–four (24) Months of the date of the invoice in which the error first occurred. If any amount disputed by such Party is determined to be due the other Party in accordance with Article 13, or if the Parties resolve the payment dispute, the amount due shall be paid within five (5) Days of such determination or resolution, along with interest accrued at the Interest Rate from the date due until the date paid.

**7.4   Records**. Each Party shall keep and maintain all records as may be necessary or useful in performing or verifying the accuracy of all relevant data, estimates or statements of charges submitted hereunder until the later of (i) a period of at least twenty-four (24) Months after the date an invoice was received by a Party, or (ii) if there is a dispute relating to an invoice, the date that is twenty-four (24) Months after the date on which such dispute is resolved.

**7.5   Audit**.

**(a)** Each Party, through its authorized representatives, shall have the right, at its sole expense and upon thirty (30) Days written notice, during normal business hours, to examine the records of the other Party to the extent reasonably necessary to verify the accuracy of any statement, charge or computation made hereunder. Upon request, each Party shall provide to the other Party statements evidencing the electric energy delivered at the Delivery Point. If any statement is found to be inaccurate, a corrected statement shall be issued and any amount due thereunder will be promptly paid and shall bear interest calculated at the Interest Rate from the date of the overpayment or underpayment to the date of receipt of the reconciling payment. The foregoing notwithstanding no adjustment shall be made with respect to any statement or payment hereunder unless a Party questions the accuracy of such payment or statement within twenty-four (24) Months after the date of such statement or payment. Audit rights under this Agreement shall be subject to the auditing Party's obligations of confidentiality to third parties.

**(b)** Seller will also provide to Buyer from time to time the following information with respect to the Project:

(i)        The manufacturers' guidelines and recommendations for maintenance of the Project equipment, to the extent not confidential or proprietary;

(ii)        A report summarizing the results of maintenance performed during each Planned Outage and any Forced Outage, and upon request of Buyer any of the technical data obtained in connection with such maintenance;

(iii)        Before the Commercial Operation Date, on or before the tenth (10th) Day of each Month, a monthly progress report stating the percentage completion of the Project and a brief summary of construction activity during the prior Month; and

(iv)        Before the Commercial Operation Date, on or before the tenth (10th) Day of each Month, a monthly report containing a brief summary of construction activity contemplated for the next Month.

Upon reasonable prior notice but in no event less than three (3) Business Days and subject to the safety rules and regulations of Seller, Seller will provide Buyer and its authorized agents, employees and inspectors with reasonable access to the Premises and the Project: (i) for the purpose of reading or testing metering, SCADA and/or communications equipment in accordance with Section 3.20, (ii) as necessary to witness any required capacity tests necessary to determine the amount of capacity associated with the Project , (iii) in connection with the operation and maintenance of the Interconnection Facilities.

## ARTICLE 8

## ASSIGNMENT; BINDING EFFECT

**8.1 Assignment**. Neither Party shall assign this Agreement or any of its rights or obligations hereunder without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed; provided, that either Party may, upon written notice, but without the need for consent from the other Party, (1) transfer, sell, pledge, encumber or assign this Agreement or the accounts, revenues or proceeds hereof in connection with any financing or other financial arrangements in accordance with Section 8.3; (2) transfer or assign this Agreement to an Affiliate of such Party; (3) transfer or assign this Agreement to any Person succeeding to all or substantially all of the assets of such Party; or (4) transfer or assign this Agreement to any Person succeeding to all or substantially all of the assets of such Party located at the Premises to the extent that the assignment or transfer of this Agreement is necessary to allow such purchaser or assignee to sell Net Electricity generated at such location to Buyer pursuant to this Agreement (5) in connection with a merger with another Person or any other transaction to which Buyer or Seller is a party resulting in a change of control of Buyer or Seller, as applicable. In each such case, the assignee shall (a) agree in writing to be bound by the terms and conditions hereof and furnish a copy of the assignment document to the other Party, and (b) possess the same or similar experience, and has satisfied the applicable Credit Requirements. Any assignment in violation of this provision shall be void. The foregoing notwithstanding and subject to the conditions herein, Buyer shall have the right to assign an interest in this Agreement to one or more of its wholesale customers, provided that such assignment shall be for no less than 5% of the Product sold hereunder.

**8.2   Assumption by Assignee; No Release from Liabilities**. Any permitted assignee or transferee of a Party's interest in this Agreement shall assume all existing and future obligations of such Party to be performed under this Agreement. Unless otherwise agreed to by the Parties, upon any permitted assignment of this Agreement to an assignee that satisfies the applicable Credit Requirements and such assignee's written assumption of this Agreement, the assigning Party shall be released from the performance of its obligations under this Agreement for the period from and after the date of such assignment and assumption; provided, however, that in all other cases, the assigning Party shall continue to be bound by this Agreement unless the Parties otherwise agree.

**8.3 Mortgages**. Seller may without Buyer's consent collaterally assign, encumber, pledge or mortgage its rights hereunder for security of any indebtedness or obligation in favor of any party providing debt financing to the Project and (i) upon giving notice to Buyer of such pledge and mortgage (A) the pledgee or mortgagee shall be entitled, as between Buyer and such party, to exercise all rights and remedies it may have with respect to this Agreement without the further consent of Buyer, to receive a copy of any notice given by Buyer or Seller pursuant to the terms hereof, and to deliver any notice permitted under this Agreement on Seller's behalf, and (B) Buyer shall be entitled to assume the due authority of the pledgee or mortgagee in taking any action or authorizing any notice without the necessity of independently reviewing the pledge, mortgage, or other security instrument delivered by Seller to the pledgee or mortgagee and to accept performance by the pledgee or mortgagee of any duty or obligation of the Party hereunder, and (ii) upon giving Buyer a copy of a trustee's deed, deed in lieu of foreclosure, or other instrument pursuant to which the pledgee, mortgagee, or other Person acquires legal title to this Agreement (A) the pledgee, mortgagee, or other Person shall assume

24

Seller's duties and obligations hereunder, provided, that the liability of any such pledgee or mortgagee under this Agreement following such assumption shall be limited to its interests under the Agreement, and (B) Buyer shall accept the pledgee, mortgagee, or other Person as the successor to the Party under the Agreement.  Upon request by Seller from time to time in connection with its financing of the Project, Buyer agrees to execute and deliver a consent or other direct agreement with debt or equity financing parties containing customary and reasonable terms and conditions, and each Party agrees to cooperate with the reasonable due diligence efforts of such financing parties.

**8.4**   **Binding Effect**.   This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.

## ARTICLE 9

## FORCE MAJEURE; INDEMNITY; LIMITATION OF LIABILITY

**9.1**   **Force Majeure**.   If either Party is rendered unable by Force Majeure to carry out, in whole or in part, its obligations under this Agreement, then, during such event of Force Majeure, but for no longer period, the obligations of the claiming Party (other than any liability for breach of any obligations that were to be performed or that accrued prior to the event of Force Majeure including but not limited to the obligation to make payments then due or becoming due with respect to performance prior to the event of Force Majeure ) shall be suspended to the extent of such disability and the claiming Party shall be excused from the performance of its obligations . The claiming  Party shall (a) give the other Party written notice as soon as practicable but no later than ten (10) Business Days after the commencement of the Force Majeure event, with details to be supplied within three (3) Business Days after such notice is provided   further describing the particulars of the occurrence of the Force Majeure event, and (b) take all reasonable steps to remedy the cause of the Force Majeure with all reasonable dispatch; provided, that this provision shall not require Seller to deliver, or Buyer to receive, any portion of the  Net Electricity at points other than the Delivery Point.  For the avoidance of doubt, in the event of an event of Force Majeure with respect to Buyer, Seller may sell all or a portion of the Product to any Person.

In addition, any completion milestones in respect of the Project, including but not limited to the achievement of the Commercial Operation Date, shall be extended on a Day-for-Day basis consistent with the length of the Force Majeure event. Notwithstanding the foregoing, in no event will any Force Majeure event extend this Agreement beyond its Term; provided, however, if a Force Majeure event extends more than two hundred and seventy (270) consecutive Days , either Party may thereafter terminate this Agreement by written notice without further liability to either Party. The claiming Party shall promptly notify the non-claiming Party when it is able to resume performance of its obligations and compliance with the conditions under this Agreement, if it is able to do so.  Until the non-claiming Party is so notified, it shall not be required to perform or resume performance of its obligations to the claiming Party corresponding to the obligations of the claiming Party excused by an event of Force Majeure.

**9.2  Indemnification.**

**(a) Indemnity**. To the extent permitted by Law, and subject to the provisions of Section 9.2(c), each Party (the "Indemnifying Party")shall indemnify and hold harmless the other Party and its Affiliates, and each of their officers, directors, agents and employees (the "Indemnified Party") from and against any and all claims, demands, actions, losses, liabilities, expenses (including reasonable legal fees and expenses), suits and proceedings of any nature whatsoever for personal injury, death or property damage to each other's property or facilities or personal injury, death or property damage to third Parties (collectively, the "Liabilities") to the extent arising out of, resulting from, or caused by the negligent acts or omissions, willful misconduct or strict liability of the indemnifying Party, its Affiliates, directors, officers, employees, or agents.

Without limiting the foregoing, to the extent permitted by Law,  Buyer shall indemnify Seller for all Liabilities related to  Net Electricity  sold and delivered to Buyer at the Delivery Point, and Seller shall indemnify Buyer for all Liabilities related to  Net Electricity prior to its delivery by Seller at the Delivery Point, except to the extent such Liabilities  arise out of, result from, or are caused by the  negligence, willful misconduct or breach of this Agreement  of the Indemnified Party.

**(b) Control of Defense**.  A potential Indemnifying Party shall notify the potential Indemnified Party in writing following its receipt of the claim notice whether or not the potential Indemnifying Party agrees that the claim is subject to this Section 9.2 and, if so, whether the Indemnifying Party elects to undertake, conduct and control, through counsel of its choosing and at its sole risk and expense, the settlement or defense of the claim.  If the Indemnifying Party notifies the Indemnified Party that it elects to undertake the settlement or defense of the claim, the Indemnified Party shall reasonably cooperate with the Indemnifying Party in connection therewith including, without limitation, by making available to the Indemnifying Party all relevant information and the testimony of employees and agents material to the defense of the claim; provided, however, that the Indemnified Party may retain counsel and participate, at the Indemnified Party's own expense, in the defense of any claim arising under this Section.  The Indemnifying Party shall reimburse the Indemnified Party for reasonable out-of-pocket costs incurred in connection with such cooperation.

If the Indemnifying Party fails for any reason to assume control of the defense of a claim in accordance with this Section 9.2, the Indemnified Party may contest, defend and litigate, with counsel of its own selection, any claim by any third party alleged or asserted against the Indemnified Party in respect of, resulting from, related to or arising out of any matter for which it is entitled to be indemnified hereunder, and the reasonable costs and expenses thereof shall be subject to the indemnification obligations of the Indemnifying Party hereunder.

No Indemnifying Party shall be entitled to settle or compromise any claim without the prior written consent of the Indemnified Party; provided that the Indemnifying Party may settle or compromise any claim without the approval of the Indemnified Party so long as: (i) such claim is solely for monetary damages that are paid in full by the Indemnifying Party; (ii) the settlement resolving the claim acknowledges the settlement is a compromise of disputed claims and that neither the settlement nor any provision thereof, nor any consideration given thereunder is to be construed as, or offered as evidence of, an admission or an acknowledgement of the validity or merit, or lack thereof, of the disputed claims; and (iii) the Indemnified Party is fully released from liability by the claimant.

26

Notwithstanding any other provision of this Article 9 to the contrary, any fines, penalties or other costs incurred by either Party, or such Party's agents, employees or subcontractors for non-compliance by such Party, its Affiliates or any of their agents, employees or subcontractors with applicable Law will be the sole responsibility of such non-complying Party and will not be subject to the indemnity obligations hereunder.

**(c)     Allocation of Liability**     NOTWITHSTANDING SECTION 9.2(a), WHEN ANY CLAIM FOR INDEMNIFICATION RESULTS FROM JOINT OR CONCURRENT NEGLIGENCE, GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR STRICT LIABILITY OF BOTH PARTIES, EACH PARTY'S DUTY OF INDEMNIFICATION SHALL BE PROPORTIONATE TO SUCH PARTY'S SHARE OF JOINT OR CONCURRENT NEGLIGENCE, GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR STRICT LIABILITY AS DETERMINED BY A COURT OF COMPETENT JURISDICTION.

**9.3 Limitation on Damages for Certain Types of Failures.** Notwithstanding anything to the contrary in this Agreement, Seller's aggregate liability for (i) failure of Seller to construct the Project and/or (ii) failure of one hundred percent (100%) of the Project's Turbines to achieve the Commercial Operation Date on the Scheduled COD and/or (iii) failure of one hundred percent (100%) of the Project's Turbines to achieve the Commercial Operation Date on June 1, 2011 and/or (iv) a Termination Payment, shall be limited in the aggregate to sixty million dollars ($60,000,000). Buyer's damages for failure to perform its material obligations under this Agreement shall likewise be limited in the aggregate to sixty million dollars ($60,000,000).

**9.4 Waiver and Exclusion of Other Remedies.** THE PARTIES CONFIRM THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THIS AGREEMENT SATISFY THE ESSENTIAL PURPOSES HEREOF. ALL LIMITATIONS OF LIABILITY CONTAINED IN THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, THOSE PERTAINING TO SELLER'S OVERALL LIMITATION OF LIABILITY AND THE WAIVER OF CONSEQUENTIAL DAMAGES, SHALL APPLY EVEN IF THE REMEDIES FOR BREACH OF WARRANTY PROVIDED IN THIS AGREEMENT ARE DEEMED TO "FAIL OF THEIR ESSENTIAL PURPOSE" OR ARE OTHERWISE HELD TO BE INVALID OR UNENFORCEABLE.

FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS AND EXCLUSIVE REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, THE OBLIGOR'S LIABILITY SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN, THE OBLIGOR'S LIABILITY SHALL BE LIMITED TO DIRECT DAMAGES ONLY. EXCEPT WITH RESPECT TO THIRD-PARTY INDEMNITY CLAIMS PURSUANT TO SECTION 9.2, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT, CONTRACT OR OTHERWISE.

TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, THAT OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT, AND THAT THE LIQUIDATED DAMAGES CONSTITUTE A REASONABLE APPROXIMATION OF THE ANTICIPATED HARM OR LOSS.  IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE.  THE PARTIES HEREBY WAIVE ANY RIGHT TO CONTEST SUCH PAYMENTS AS AN UNREASONABLE PENALTY.

**9.5**   **Duty to Mitigate**.   Each Party has a duty to mitigate damages and will use Commercially Reasonable Efforts (including the payment of commercially reasonable amounts, which will be included as part of such damages) to minimize any damages it may incur as a result of the other Party's default or non-performance of this Agreement. The Parties shall exercise Commercially Reasonable Efforts when purchasing or selling to or from any other Person, as the case may be, capacity, electric energy, environmental Credits, or Ancillary Services in order to mitigate damages pursuant to this Section 9.5.

**ARTICLE 10**

**CREDIT SUPPORT**

**10.1**   **Buyer's Credit Support**.  The Parties acknowledge and agree that, as of the Effective Date, Buyer satisfies the Ratings Threshold.   For so long as Buyer satisfies the Ratings Threshold  during the Term and no Event of Default or an event which with the passage of time would constitute an Event of Default, has occurred and is continuing,  Buyer shall not  be obligated to post or issue, or cause to be posted or issued, Credit Support. If, at any time after the Effective Date, Buyer fails to satisfy the Ratings Threshold (the "Downgrade") Buyer shall notify Seller in writing of the occurrence of such event within one (1) Business Day thereafter and shall post Credit Support in favor of Seller in an amount reasonably determined by Seller that secures Buyer's performance of its obligations under this Agreement within five (5) Business Days of the Downgrade. Buyer's failure to provide Credit Support to Seller within five (5) Business Days of such Downgrade will constitute an Event of Default under Article 6.

**10.2 Seller's Credit Support.** The Parties acknowledge and agree that, as of the Effective Date, Seller does not on a stand alone basis satisfy the Ratings Threshold. For so long as during the Term (a) Seller does not on a stand alone basis satisfy the Ratings Threshold  during the Term (b) Seller remains wholly indirectly owned by E.ON AG, (c) Seller posts in favor of Buyer a guaranty substantially in the form of Exhibit D provided by E.ON Climate & Renewables GmbH, a wholly owned subsidiary  of E.ON AG in the amount of sixty million dollars ($60,000,000) which amount shall be reduced to twenty million dollars ($ 20,000,000) on the first anniversary of the Commercial Operation Date (the "Seller's Guaranty") and (d) E.ON AG remains rated at or above the Ratings Threshold and the payment obligations of Seller's Guarantor remain credit enhanced under that certain Domination and Profit and Loss Agreement between E.ON AG and

28

the predecessor-in-interest of Seller's Guarantor dated February 14, 2006 (the "DPLA") and an associated letter of awareness  (the "LOA") (the DPLA and LOA collectively, the "Credit Enhancements"), then Seller's Guaranty shall be deemed to be acceptable Credit Support hereunder. In the event Seller's Guaranty or the Credit Enhancements are terminated for any reason at any time during the Term and Seller fails to provide alternate Credit Support within five (5) Business Days of such termination, such failure shall constitute an Event of Default under Article 6.

**10.3  Replenishment of Credit Support**.  If Buyer or Seller post Credit Support during the Term of this Agreement (each a "Posting Party") the Posting Party shall replenish the Credit Support for and up to the amount of any draws under such Credit Support by the non-Posting Party under this Agreement not to exceed the cap of sixty million dollars ($60,000,000) in Section 9.3.  Any such replenishment shall be performed on or before the date that is five (5) Business Days after such draw by the non-Posting Party under such Credit Support.

**10.4  Return of Credit Support.**  Any Credit Support provided by a Party pursuant to this Article 10 shall be returned to the Posting Party by the non-Posting Party within five (5) Business Days after posting of Credit Support is no longer required under the terms hereunder

## ARTICLE 11

## CONFIDENTIALITY

**11.1  Confidentiality**.  The Parties' proposals and negotiations prior to the Effective Date concerning this Agreement, the terms of this Agreement, the actual charges billed to Buyer under this Agreement, the operation, maintenance and technical support, know-how and processes applicable to each specific   Project Turbine, as well as information regarding generation output, transmission, interconnection and non-technical aspects such as the permits and land access agreements of the Project (collectively the "Project Information"), and any such Project Information provided to Buyer shall be deemed to be   "Confidential Information" . Seller and Buyer each agree to hold such Confidential Information confidential except to the extent permitted to be disclosed under Section 11.6.  Such Confidential Information may only be used by the Parties for purposes related to the approval, administration or enforcement of this Agreement and for no other purpose. Confidential Information shall not include general descriptive information about the Project such as its total nameplate capacity, the name of the Turbine manufacturer and the model name of the Project's Turbines, the location and geographical description of the Project and the projected size of Seller's development in and around the Project, identifying Buyer as the purchaser of Net Electricity and the Term of this Agreement. Except as otherwise expressly provided herein, neither Party shall, unless authorized in writing by the other Party to do so, allow access, distribute or disclose any of the Confidential Information, or any facts related thereto to any Person (other than those otherwise authorized pursuant to this Article 11).

**11.2  Disclosure to Affiliates and Representatives.**  Notwithstanding the foregoing, each Party may disclose Confidential Information to such Party's Affiliates and any of such Party's or such Party's Affiliates' employees, officers, board members, consultants and attorneys and other Persons involved in assisting such Party or such Party's Affiliates, including, in the case of the

Seller, the Project lender, and, in the case of Buyer, its wholesale customers, in connection with this Agreement (the "Representatives"), provided that such Representatives are informed of and agree in writing to be bound by the requirements of this Article 11. A receiving Party shall ensure that all Representatives to whom it discloses Confidential Information under this Agreement shall keep such information confidential and shall not disclose or divulge the same to any unauthorized Person pursuant to the requirements of this Agreement.

**11.3 Disclosure Pursuant to Applicable Law**. Notwithstanding anything to the contrary in this Article 11, in the event a receiving Party is requested pursuant to applicable Law to disclose Confidential Information, such receiving Party shall, to the extent permitted by applicable Law, give the disclosing Party prompt written notice of such request so that the disclosing Party may seek an appropriate protective order. If, in the absence of a protective order, the receiving Party is nonetheless advised by counsel that disclosure of the Confidential Information is finally required (after, if advance notice to the disclosing Party is permitted by applicable Law, exhausting any appeal requested by the disclosing Party at the disclosing Party's expense), the receiving Party may disclose such Confidential Information.

**11.4 Disclosure to Lenders**. Notwithstanding anything to the contrary in this Article 11, Confidential Information may be disclosed: (a) by Seller to any Project lender, institutional investor or potential purchaser of Seller or of all or substantially all assets of Seller; or (b) by either Party to any other entity expressing an interest in providing equity or debt financing or refinancing and/or credit support to such Party (and to any agent of or consultant to such entity), and the agent or trustee of any of the foregoing so long as the Person to whom Confidential Information is disclosed agrees in writing to be bound by the confidentiality provisions of this Article 11 to the same extent as if it were a Party.

**11.5 Injunctive Relief**. Each of the Parties acknowledges and agrees that the other Party would be irreparably harmed if any Confidential Information of the disclosing Party were to be disclosed to third Persons, or if any use were to be made of such Confidential Information other than that permitted under this Agreement, and further agrees that the disclosing Party shall have the right to seek injunctive relief upon any violation or threatened violation of the terms of this Article 11, in addition to all other rights and remedies available at law or in equity, without having to post a bond or other security.

**11.6 Public Announcements**. Neither Party may issue or make any public announcement, press release or statement regarding this Agreement unless such public announcement, press release or statement is issued jointly by the Parties or, prior to the release of the public announcement, press release or statement, such Party furnishes the other Party with a copy of such announcement, press release or statement, and obtains the approval of the other Party, such approval not to be unreasonably withheld, conditioned or delayed; provided that, notwithstanding any failure to obtain such approval, no Party shall be prohibited from issuing or making any such public announcement, press release or statement if it is necessary to do so in order to comply with applicable Laws, legal proceedings or rules and regulations of any stock exchange having jurisdiction over such Party or such announcement is limited to disclosing Buyer's and Seller's names, location and general description of the Project, capacity sold to Buyer, Scheduled Commercial Operation Date and Term of this Agreement.

## ARTICLE 12

## NOTICES AND ADDRESS FOR PAYMENT

Except as may be otherwise expressly provided for herein, .all notices, requests, statements or payments shall be made in writing to the addresses set out below. Except where this Agreement expressly provides that notice may be made orally, notices required to be in writing shall be delivered by hand delivery , express courier, facsimile or electronic mail  (so long as a copy of such electronic mail notice is provided thereafter by hand delivery or express courier). Except as may otherwise be specified in this Agreement, all notices, requests, statements and other communications shall be deemed to have been duly given on (a) the date of delivery if delivered by hand or by express courier, (b) the time stamp upon delivery if sent by electronic mail, (c) date of receipt of a time-stamped, legible copy thereof if sent by facsimile; provided that deliveries under (b) or (c) shall be deemed to have been made upon the next Business Day if made after the close of business on any Business Day or on any other Day. Only notices under Sections 6.2(c) and 9.1 shall require delivery of a copy to Buyer's legal counsel as provided below.   A Party may change its address or its payment instructions by providing the other Party with at least ten (10) Days prior notice thereof in accordance herewith:

|   |   |
|---|---|
| To Buyer: | Lower Colorado River Authority |
|   | Attn:  Executive Manager, Wholesale Power Services |
|   | 3700 Lake Austin Blvd. |
|   | Austin, TX 78703 |

Payment Instructions:

By wire transfer:

JPMorgan Chase Bank
ABA: 021 000  021
Account Name:  LCRA Revenue Fund
Account No.: 0990097101

By ACH:

JPMorgan Chase Bank of Texas
ABA: 111 000 614
Account Name:  LCRA Revenue Fund
Account No.: 0990097101

|   |   |
|---|---|
| To Seller: | Papalote Creek Wind Farm II, LLC |
|   | 353 N. Clark Street |
|   | 30th Floor |
|   | Chicago, IL 60654 |

31

Attn: Dominic Serpe, Vice President, Energy Contracts & Regulatory Compliance
Phone: 312-245 3033

Wire transfer instructions:

Bank:       US Bank N.A.
              209 S LaSalle St. - Ste 400
              Chicago , IL   60604

Beneficiary:   E.ON Climate & Renewables North America, Inc.
Address:     353 N. Clark Street
             30th Floor
             Chicago, IL 60654

Account:     1993 8000 8359

ABA/Routing:  071 904 779

# ARTICLE 13

## DISPUTE RESOLUTION

**13.1** **Consultation.** If any dispute arises with respect to either Party's performance hereunder, the senior officers or executives of Buyer and senior officers or executives of Seller shall meet to attempt to resolve such dispute, either in person or by telephone, within five (5) Business Days after the written request of either Party.  If such senior officers or executives are unable to resolve such dispute within ten (10) Days after their initial meeting (in person or by telephone), either Party may refer the dispute to the procedures outlined in the remainder of this Article 13.

**13.2** **Arbitration**.  After the expiration of the ten (10) Day period described in Section 13.1 hereunder, either Party may submit any disputes arising under this Agreement, which cannot be resolved by the Parties to binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") effective at the time of the dispute (the "AAA Rules") and the terms of this Section 13.2  If the AAA Rules are in conflict with this Section 13.2 including the provisions concerning the appointment of arbitrators, the provisions of this Section 13.2 shall control.

The process shall be initiated by either Party delivering to the other a written notice requesting arbitration, with the other Party to respond to such request within ten (10) Business Days.  The

Parties shall select a single arbitrator with knowledge of and over five (5) years of professional experience in connection with similar transactions and who has not previously been employed or retained by either Party and who does not have a direct or indirect interest in either Party or the subject matter of the arbitration. Such arbitrator shall be mutually agreed by the Parties within thirty (30) Days after written notice from either Party requesting arbitration, or failing agreement, shall be selected under the expedited rules of the AAA.  Such arbitration shall be held in alternating locations of the home offices of the Parties, commencing with initiating Party's home office or in any other mutually agreed upon location.  The rules of the AAA shall apply to the extent not inconsistent with the rules herein specified.  The arbitration shall be conducted according to the following procedures:

(a) The arbitration hearing shall commence no later than thirty (30) Days after the selection of the arbitrator, (b) not later than seven (7) Days prior to the hearing date set by the arbitrator each Party shall submit a brief detailing its factual and legal position and a final offer for settlement of the dispute including a dollar amount, if appropriate, (c) the hearing shall be conducted on a confidential basis without continuance or adjournment, (d) the arbitrator shall be limited to selecting only one of the two offers or, if applicable, one of the dollar amounts submitted by the Parties, (e) each Party shall divide equally the cost of the arbitrator and the hearing and each Party shall be responsible for its own expenses and those of its counsel and representatives, and (f) evidence concerning any offer made or the details of any negotiation prior to arbitration and the cost to the Parties of their representatives and counsel shall not be permissible.  The award of the arbitrator shall be made no later than thirty (30) Days after the date of closing of the hearing, or if oral hearings have been waived, after the date of transmitting the final statements and proof to the arbitrator; provided, however, that in no event shall any award be made later than one hundred and twenty (120) Days.

(b) Provided that a declaration of early termination of this Agreement pursuant to Section 6.3 or otherwise has not occurred, each Party shall continue to perform its obligations under this Agreement during the continuation of any dispute pursuant to this Article 13.

(c) The Parties hereby waive any rights of application or appeal to any court or tribunal of competent jurisdiction to the fullest extent permitted by applicable Law in connection with any question of law or fact arising in the course of the arbitration or with respect to any award made except as provided in this Article 13.

(d) Except to the extent necessary to enforce the arbitration agreement or award, to enforce other rights of the Parties hereunder, or as required by applicable Law, the Parties, their Affiliates, and all of the employees, officers, directors, counsel, consultants, and expert witnesses, shall maintain as Confidential Information (pursuant to Article 11) the fact of the arbitration proceedings, the arbitral award, filings or submissions exchanged or produced during the arbitration proceedings, and briefs or other documents prepared in connection with the arbitration.

(e)   Any award rendered by the arbitrator hereunder shall be final and binding upon the Parties as from the date rendered, and shall be the sole and exclusive remedy between the Parties regarding any claims, counterclaims, issues or accounting presented to the arbitral tribunal.   Judgment upon any award may be entered in any court having jurisdiction under applicable Law over the assets of the Party owing the award or judgment, or application may be made to such court for judicial acceptance of the award and an order of enforcement, as the case may be.

(f)   Each Party hereby submits to the exclusive jurisdiction and venue of any Texas state or federal court in any action, suit or proceeding with respect to the enforcement of the arbitration agreement in this <u>Section 13.2</u> and the exclusive jurisdiction of such court with respect to the enforcement of any award thereunder. Each Party agrees that such court shall have the power to provide any necessary interim relief prior to the formation of the arbitral tribunal.

## ARTICLE 14

## <u>MISCELLANEOUS</u>

**14.1 <u>Entirety</u>**.   This Agreement constitutes the entire agreement between the Parties and supersedes any prior or contemporaneous discussions, agreements, proposal, solicitation, terms and conditions, or representations of the Parties affecting the same subject matter.

**14.2 <u>Amendment</u>**.   No amendment, modification or change to this Agreement shall be enforceable unless set forth in writing and executed by both Parties.

**14.3 <u>Choice of Law and Forum</u>**.   This Agreement shall be governed, construed, enforced and performed in accordance with the laws of the State of Texas, without regard to principles of conflicts of law.   EACH OF THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT EITHER OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION, CLAIM OR PROCEEDING BASED UPON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH, THIS AGREEMENT.   THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS AGREEMENT.

**14.4 <u>Waiver</u>**.   No waiver by either Party   of any one or more defaults by the other Party in the performance of any of the provisions of this Agreement shall be construed as a waiver of any other default or defaults whether of a like kind or different nature. No failure or delay by any Party in exercising any right, power, privilege, or remedy hereunder shall operate as a waiver thereof.

**14.5   <u>Drafting and Interpretation.</u>** Each Party acknowledges that it was represented by counsel in connection with this Agreement and that this Agreement shall be deemed for all purposes as prepared through the joint efforts of the Parties and shall not be construed against one Party or the other as a result of the preparation, substitution, submission or other event of negotiation, drafting or execution hereof.

**14.6   <u>Severability.</u>** Any provision of this Agreement declared or rendered invalid, unlawful, or unenforceable by any applicable Governmental Authority or deemed unlawful because of a

change in applicable Law (individually or collectively, such events referred to as "Regulatory Event") shall not otherwise affect the remaining lawful obligations that arise under this Agreement; and provided further, that if a Regulatory Event occurs, the Parties shall use Commercially Reasonable Efforts to reform this Agreement in order to give effect to the original intention of the Parties.

**14.7  Forward Contract.**  The Parties acknowledge and agree that this Agreement and the transactions contemplated by this Agreement constitute a "forward contract" within the meaning of the United States Bankruptcy Code.

**14.8  No Third Party Beneficiaries.**  Nothing in this Agreement shall provide any benefit to any third Person or entitle any third Person to any claim, cause of action, remedy or right of any kind, it being the intent of the Parties that this Agreement shall not be construed as a third party beneficiary contract.

**14.9  Relationships of Parties.**  The Parties shall not be deemed to be in a relationship of partners or joint venturers by virtue of this Agreement, nor shall any Party be an agent, representative, trustee or fiduciary of the other Party.  Neither Seller nor Buyer shall have any authority to bind the other to any agreement.

**14.10  Non-Recourse Obligations.**  Notwithstanding any other provision of this Agreement, no Person (nor any officer, employee, executive, director, agent or authorized representative of any such Person) other than Seller and Buyer and, to the limited extent explicitly set forth in any Credit Support documentation, the Person obligated to provide such Credit Support, shall be liable for any payments due hereunder or for the performance of any obligation hereunder.

**14.11  Survival.**  The provisions of Sections 3.22 (with respect to all periods prior to termination), 7.4, 7.5, 9.2, 9.3, 9.4, Articles, 11, 12, 13 and Section 14.3 shall survive the termination of this Agreement.

**13.12  Headings; Attachments.**  The headings used for the sections and articles herein are for convenience and reference purposes only and shall in no way affect the meaning or interpretation of the provisions of this Agreement.  Any and all attachments referred to in this Agreement are, by such reference, incorporated herein and made a part hereof for all purposes.

**13.13  Counterparts.**  This Agreement may be executed in several counterparts, each of which is an original and all of which constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

The Lower Colorado River Authority

By: _____

Name: Thomas G. Mason

Title:   General Manager


Papalote Creek Wind Farm, II LLC

By: _____

Name: Steve Trenholm

Title:  CEO

**EXHIBIT A**

**TECHNICAL DESCRIPTION OF FACILITIES OF PROJECT**

1.  Eighty-seven (87) Siemens 2.3 MW wind turbine generator system with grounding, comprising a three-bladed, horizontal-axis wind turbine, employing active yaw control, active blade pitch control and a variable speed generator, more precisely described as follows:

    a.  Rotor with a diameter of 101 m, designed to operate in upwind configuration, comprised of three blades mounted to a cast iron hub, designed to operate between 0 and 16 rpm

    b.  Three blades manufactured from carbon fiber, wood, fiberglass, epoxy.

    c.  Blade pitch control system

    d.  Hub manufactured from cast iron connecting the blades to the turbine main shaft and housing the blade pitch systems

    e.  Gearbox with vibration-damping mountings and a parking brake

    f.  Bearings

    g.  Gearbox lubrication system

    h.  Brake system,

    i.  Variable speed asynchronous generator

    j.  Flexible coupling to protect drive train from excessive torque loads

    k.  Yaw system

    l.  87 Towers, 80 m ground to hub.

    m.  Nacelle, with sound-insulating foam to reduce acoustic emissions

    n.  Anemometer, wind vane and lightning protection system.

    o.  Control system consisting of on-site (at base of tower) and remote (SCADA) control with local lockout capability

2.  Roadwork, sloped for drainage, with turnouts from public roads

3. Fencing to control livestock and to protect substations, grounding transformers and other electrical equipment

4. 87 wind turbine generator foundations, with anchor bolt embeds and template rings

5. FAA lighting as per regulatory requirements

6. Telephone system

7. VAR reactive power control system

8. Substations, including a 138/34.5 kV utility interconnect substation, including two 140 MVA transformers with load tap changers, 138 kV circuit breakers and 34.5 circuit breakers.

9. Overhead transmission line, 138 kV between the substation and the utility interconnection

10. Underground power cables from pad mount transformers to the substation, and various cable accessories, with grounding.

11. O&M building, with standard utilities

12. Permanent meteorological towers, quantity and location of which to be determined by final turbine layout.

13. 87 Padmount transformers

14. Communication cable terminations

**EXHIBIT B**

**MAP OF LOCATION**



**EXHIBIT C**

**CONTRACT YEAR EXPECTED METERED OUTPUT**

| Month | GWh |
|---|---|
| January | 58.9 |
| February | 58.2 |
| March | 76.1 |
| April | 71.5 |
| May | 63.6 |
| June | 64.2 |
| July | 47.7 |
| August | 39.7 |
| September | 33.1 |
| October | 42.4 |
| November | 49.0 |
| December | 57.6 |
| **TOTAL** | **662** |

# EXHIBIT C (CONTINUED)

## EXAMPLE CALCULATION FOR SECTION 3.5

| Month | Net Electricity Generated Monthly (GWh) | % of Net Electricity Generated Monthly (%) | Monthly Average LCRA SPP ($/MWh) | Weighted Monthly Average LCRA SPP ($/MWh) |
|---|---|---|---|---|
| January | 50 | 10.4% | $ 33.61 | $ 3.50 |
| February | 50 | 10.4% | $ 32.95 | $ 3.43 |
| March | 50 | 10.4% | $ 31.17 | $ 3.25 |
| April | 40 | 8.3% | $ 34.99 | $ 2.92 |
| May | 40 | 8.3% | $ 34.34 | $ 2.86 |
| June | 40 | 8.3% | $ 35.67 | $ 2.97 |
| July | 20 | 4.2% | $ 37.11 | $ 1.55 |
| August | 20 | 4.2% | $ 38.51 | $ 1.60 |
| September | 20 | 4.2% | $ 37.67 | $ 1.57 |
| October | 50 | 10.4% | $ 33.19 | $ 3.46 |
| November | 50 | 10.4% | $ 29.82 | $ 3.11 |
| December | 50 | 10.4% | $ 33.28 | $ 3.47 |

CONTRACT YR ACTUAL METERED OUTPUT (GWh)      480
(Sum of monthly net electricity)

ANNUAL AVERAGE LCRA SPP ($/MWh)      $ 33.68
(Sum of Weighted Monthly Average LCRA SPP)

MINIMUM OUTPUT LIQUIDATED DAMAGES CALCULATION
CONTRACT YR ACTUAL METERED OUTPUT (GWh)    480
DEEMED GENERATED ENERGY    5
SUM OF METERED OUTPUT & DEEMED GENERATED ENERGY (GWh)    485

CONTRACT YR MINIMUM METERED OUTPUT (GWh)
Contract Year Expected Metered Output (GWh)    662
Contract Year Minimum Metered Output (75% of expected) (GWh)    75%    496.5

ENERGY SHORTFALL (GWh)    11.5
(Contract Yr Min Output less Sum of Actual Energy + Deemed Generated Energy)

MINIMUM OUTPUT LIQUIDATED DAMAGES    $ 387,317
(Energy Shortfall x Annual Average LCRA SPP)

# EXHIBIT D

# GUARANTY

This Guaranty Agreement (the "**Guaranty**"), dated as of [Insert date of execution.], 2009, is made by  (the "**Guarantor**"), for the benefit of The Lower Colorado River Authority (referred to herein as the "**Beneficiary**") and guarantees the obligations (the "**Obligations**") of Papalote Creek Wind Farm II,LLC (the "**Guaranteed Subsidiary**") as such Obligations are specified in that certain Power Purchase Agreement between the Guaranteed Subsidiary and the Beneficiary dated as of [Insert Agreement execution date.], 2009 (such underlying agreement, the "**Agreement**").

1.  <u>Guaranty.</u>  For the duration of this Guaranty, as set forth in Section 3 below, the Guarantor irrevocably and unconditionally guarantees to the Beneficiary, and to any of the Beneficiary's successors and permitted assigns, the prompt and complete payment when due and payable, by acceleration or otherwise, subject to any applicable grace period, of any and all outstanding obligations and liabilities of the Guaranteed Subsidiary to the Beneficiary under or in connection with the Agreement.  In the case of the failure of the Guaranteed Subsidiary punctually to make any such payment, the Guarantor hereby agrees to make such payment or cause such payment to be made within ten (10) business days after written demand by the Beneficiary to the Guarantor (the tenth business day, the "**Due Date**"), and the Guarantor shall be liable for all costs and expenses relating to the enforcement of this Guaranty, including reasonable attorneys' fees, if payments due under this Guaranty are not made on or before the Due Date.  The aggregate amount covered by this Guaranty and the Guarantor's maximum aggregate liability under this Guaranty shall not exceed [Insert maximum liability amount in written and, in parentheses following, numeric form.], and, beyond that limit, the Guarantor will not have any liability of any kind to the Beneficiary hereunder regarding any kind of claim.

2.  <u>Nature of Guaranty.</u>  This Guaranty shall not be affected by the genuineness, validity or enforceability of the Obligations or any instrument evidencing any Obligations or by the existence, validity, enforceability, perfection or extent of any collateral therefor or by any other events, occurrences or circumstances which might otherwise constitute a legal or equitable discharge or defense of a guarantor or surety (except for defenses of payment or performance).

The Beneficiary makes no representation or warranty with respect to any such circumstance and has no duty or responsibility whatsoever to the Guarantor with respect to the management and maintenance of the Obligations or any collateral therefor.  The Beneficiary shall not be obligated to file any claim relating to the Obligations in the event that the Guaranteed Subsidiary becomes subject to a bankruptcy, reorganization or similar proceeding, and the failure of the Beneficiary so to file such claim shall not affect the Guarantor's obligations hereunder.  This Guaranty constitutes a guaranty of payment when the same shall become due and payable and not of collection.  In the event any payment (in whole or part) of the Guaranteed Subsidiary in respect of any of the Obligations is rescinded or must otherwise be returned by order of a court with competent jurisdiction (the "**Returned Amounts**"), the Guarantor shall remain liable with respect thereto and shall pay such Returned Amounts no later than ten (10) business days after demand therefor by the Beneficiary.  The preceding provision shall survive the termination of this Guaranty.

This Guaranty shall not be affected by the occurrence of any Event of Default, as defined in the Agreement, by the existence of any bankruptcy, insolvency, reorganization or similar proceedings involving the Guaranteed Subsidiary or by any change in the laws of any jurisdiction amending, varying, reducing or otherwise affecting, any of the obligations of the Guaranteed Subsidiary under the Agreement or of Guarantor under this Guaranty.

3.      <u>Duration of the Guaranty</u>.  This Guaranty shall terminate on the date when all Obligations have been fully discharged or performed in accordance with the terms of the Agreement, and, upon its termination, the Guaranty shall be returned by the Beneficiary to the Guarantor.

4.      <u>Consents, Waivers and Renewals</u>.  The Guarantor agrees that the Beneficiary may, at any time and from time to time, either before or after the maturity of the Obligations, without notice to or further consent of the Guarantor, extend the time of payment of Obligations  and may make agreement with the Guaranteed Subsidiary with regard to any Obligation for the extension, renewal, payment, compromise, discharge or release thereof, in whole or in part, or for any modification of the terms thereof or of the Agreement or any other related document, without in any way impairing or affecting this Guaranty.  The Guarantor agrees that the Beneficiary may resort to the Guarantor for payment of any Obligation after any default under the Agreement, subject to any applicable grace period, by the Guaranteed Subsidiary that has incurred the Obligation and irrespective of whether or not the Beneficiary shall have resorted to any collateral security or shall have proceeded against any other obligor principally or secondarily obligated with respect to any of the Obligations.

5.      <u>No Waiver; Cumulative Rights</u>.  No failure on the part of the Beneficiary to exercise, and no delay in exercising, any right, remedy, or power hereunder shall operate as a waiver thereof nor shall any single or partial exercise by the Beneficiary of any right, remedy or power hereunder preclude any other or future exercise by the Beneficiary of any right, remedy or power.  Each and every right, remedy and power hereby granted to the Beneficiary or allowed it by law or other agreement shall be cumulative and not exclusive of any other and may be exercised by the Beneficiary from time to time.

6.      <u>Amendment.</u>  The terms and provisions hereof may not be waived, altered, modified or amended except in writing and with the written approval of duly authorized representatives of the Guarantor and Beneficiary.

7.      <u>Waiver of Notice</u>.  The Guarantor waives notice of the acceptance of this Guaranty, presentment, demand, notice of dishonor, protest, notice of any sale of collateral security and all other notices whatsoever, except as specifically provided in Section 1.

8.      <u>Subrogation</u>.  The Guarantor shall not be entitled and shall not seek, by reason of having made any payment hereunder, to be subrogated to the rights of the Beneficiary against any Guaranteed Subsidiary with respect to such payment or otherwise to be reimbursed, indemnified or exonerated by the Guaranteed Subsidiary in respect thereof until all Obligations of the Guaranteed Subsidiary to the Beneficiary have been paid in full.  If acceleration of the time for payment of any Obligation is stayed upon the insolvency, bankruptcy or reorganization of the Guaranteed Subsidiary that has incurred the Obligation, all such amounts otherwise subject to acceleration under the terms of the relevant documents

governing that Obligation shall nonetheless be payable by the Guarantor hereunder forthwith on written demand by the Beneficiary.

9.     **Reimbursement for Expenses**.  In the event that the Beneficiary commences any action or proceeding for the enforcement of this Guaranty, the Guarantor will reimburse the Beneficiary, promptly upon written demand, for any and all expenses incurred by Beneficiary in connection with such action or proceeding including, without limitation, reasonable attorneys' fees.

10.     **Representations and Warranties**.  The Guarantor as of the date hereof represents that:

it is duly organized and validly existing under the law of the jurisdiction of its incorporation and has full power and legal right to execute and deliver this Guaranty and to perform the provisions of this Guaranty;

its execution, delivery and performance of this Guaranty have been and remain duly authorized by all necessary corporate action and do not contravene any provision of law, the Guarantor's constitutional documents or any other contractual obligation binding on the Guarantor; and

this Guaranty constitutes the valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles.

11.     **Assignment**.  This Guaranty shall be binding on Guarantor and its successors and permitted assigns.  Neither the Guarantor nor the Beneficiary may assign its rights, interests, or obligations hereunder to any other person without the prior written consent of the Guarantor or the Beneficiary, as the case may be, such consent not being unreasonably withheld (it being expressly agreed that it shall not be unreasonable for the Guarantor to withhold consent to any such assignment if the assignee would be entitled to receive any greater payment than the Beneficiary making such assignment would have been entitled to receive had such assignment not occurred), except for an assignment and delegation of all of the Guarantor's rights and obligations hereunder in whatever the Guarantor determines may be appropriate to a partnership, corporation, trust or other organization in whatever form that succeeds to all or substantially all of the Guarantor's assets and business and that assumes such obligations by contract, operation of law or otherwise.  Upon such delegation and assumption of the Obligations, the Guarantor shall be relieved of and fully discharged from all Obligations hereunder whether such Obligations arose before or after such delegation and assumption.

12.    <u>Notices</u>.  All notices or other communications to the Guarantor or the Beneficiary shall be in writing and shall be given as follows:

if to the Guarantor:

E.ON AG
E.ON Platz 1
40479 Düsseldorf
Germany
[Insert name, email, telephone and facsimile contact details of designated recipient.]

with a copy to:

E.ON Climate and Renewables North America Inc.
401 N. Michigan Avenue
Suite 1720
Chicago, IL 60611
Attention:  David B. Willis

if to the Beneficiary:

[Insert name, email, telephone and facsimile contact details of designated recipient.]

unless either the Guarantor or the Beneficiary has provided a superseding address, in which event, notice shall be provided to such superseding address.

13.    <u>Governing Law, Waiver of Jury Trial, and Submission to Jurisdiction</u>.

(a)  This Guaranty shall be governed by and construed in accordance with the laws of the State of New York without reference to choice of law principles.

(b)  Both the Guarantor and the Beneficiary waive, to the fullest extent permitted under applicable law, any right either the Guarantor or the Beneficiary may have to a trial by jury in respect of any suit, action or proceeding relating to this Guaranty.  Both the Guarantor and the Beneficiary (1) certify that no representative, agent or attorney of the other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of any such suit, action or proceeding and (2) acknowledge that both the Guarantor and the Beneficiary have entered into this agreement in reliance on, among other things, the mutual waivers and certifications in this section.

(c)  With respect to any suit, action or proceeding relating to this Guaranty, both the Guarantor and the Beneficiary (1) irrevocably submit to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and (2) waive any objection which it may have at any time to the laying of venue for any such suit, action or proceeding relating to this Guaranty, waive any claim that such suit, action or proceeding relating to this Guaranty has been brought in an

inconvenient forum and further waive the right to object, with respect to such suit, action or proceeding relating to this Guaranty, that such court does not have jurisdiction over it.

14.   <u>Service of Process.</u>  Guarantor hereby appoints:

E.ON Climate & Renewables North America, Inc.
401 N. Michigan Avenue
Suite 1720
Chicago, Illinois 60611
Attention: David B. Willis
Telephone:  312-923-9465
Facsimile:  312-923-9469

as its agent to receive, for it and on its behalf and on behalf of its property, service of copies of the summons and complaint and any other process which may be served in any judicial action arising out of this Guaranty.  Such service may be made by mailing or delivering a copy of such process to such person in care of the process agent at the process agent's address above, and the Guarantor hereby authorizes and directs the process agent to accept such service on its behalf.  If the process agent ceases to maintain an office at the location specified above, Guarantor will promptly advise Beneficiary of the location of the process agent's successor offices.

IN WITNESS WHEREOF, the Guarantor has caused its duly authorized officer to execute and deliver this Guaranty as of the date first above written.

**GUARANTOR**

By:_____
    Name:
    Title:


By:_____
    Name:
    Title:

# SCHEDULE A

The scheduling procedures below (the "Scheduling Procedures") were developed based on the provisions in Section 4 of the ERCOT Nodal Protocols as proposed as of the Effective Date. If, after the Effective Date, any provisions in the ERCOT Nodal Protocols relevant to these Scheduling Procedures are revised, amended or cancelled, the Parties shall amend these Scheduling Procedures to make them consistent with the revised ERCOT Nodal Protocols and the original intention of the Parties.

## SCHEDULING PROCEDURES

## DURING THE ZONAL MARKET

No bilateral trades will occur between Seller and Buyer in the zonal market under this Agreement. Seller shall sell all Net Electricity to ERCOT, and shall invoice Buyer in accordance with Section 7.1.

## AFTER IMPLEMENTATION OF THE NODAL MARKET

Capacity Trades

The Wind-Powered Generation Resource Production Potential (WGRPP) or a successor designation, is an hourly probability-of- exceedance forecast of energy production for the Project. ERCOT will produce and send the Seller (its QSE or designee) a WGRPP for each hour for the Project.  Seller shall send electronically to Buyer the WGRPP within thirty  (30) minutes of receiving it from ERCOT.

Day Ahead

Seller (its QSE or designee) shall enter a Capacity Trade to Buyer (its QSE or designee) equal to the hourly amount of the WGRPP by Hour Ending 1400 of the Day Ahead.  Seller and Buyer shall submit the trade to ERCOT consistent with the provisions of Section 4 of the ERCOT Nodal Protocols.  The intent of this trade is to provide Day Ahead Reliability Unit Commitment (DARUC) Capacity for the Buyer from the Project.

Adjustment Period

Seller (its QSE or designee) shall enter a Capacity Trade to Buyer (its QSE or designee) equal to the hourly amount of the WGRPP for each hour of the Adjustment Period thirty (30) minutes

before the close of such Adjustment Period. Seller and Buyer shall submit the trade to ERCOT consistent with the provisions of Section 6 of the ERCOT Nodal Protocols. The intent of this trade is to provide Hourly Reliability Unit Commitment (HRUC) Capacity for the Buyer from the Project.

Energy Trade

On or before  1000 after the Operating Day, Seller and Buyer will enter an Energy Trade for the Net Electricity delivered from the Project for the prior Operating Day. Seller and Buyer will resolve any difference in the Energy trade on or before 1430 so the Energy Trade can be validated by ERCOT.  The intent of this trade is to transfer the ERCOT settlement for the actual Net Electricity generated by the Project from the Seller to the Buyer.

## AMENDMENT TO POWER PURCHASE AGREEMENT

This Amendment to Power Purchase Agreement (this "Amendment") is entered into effective as of the 19 day of March, 2013 (the "Effective Date"), by and between Papalote Creek II, LLC (a/k/a Papalote Creek Wind Farm II, LLC),  a Delaware limited liability company (the "Seller"), and The Lower Colorado River Authority,  a Texas conservation and reclamation district (the "Buyer"), herein sometimes referred to individually as a "Party" and collectively as the "Parties".

### RECITALS

1. Buyer and Seller have entered into that certain Power Purchase Agreement dated as of December 18 2009 as the same may have from time to time been modified, amended and supplemented (the "Agreement");

2. Buyer and Seller agreed to amend and restate the scheduling protocols set forth on Schedule A of the Agreement on the terms set forth in the Amended and Restated Schedule A attached hereto as Schedule 1 (the "Amended and Restated Schedule A") in order to make such protocols consistent with the revised ERCOT Nodal Procedures and the original intention of the Parties;

3.  The Parties have conducted themselves in accordance with the terms of the Amended and Restated Schedule A since the date thereof, and the Parties wish to amend the Agreement to reflect this course of conduct; and

3. The Parties have agreed to modify the definition of Letter(s) of Credit in the Agreement in certain respects as set forth herein.

### AGREEMENT

NOW THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller agree as follows:

1. Amendments.

   a. Schedule A to the Agreement is hereby deleted and replaced in its entirety with the Amended and Restated Schedule A.

   b. The definition of Letter(s) of Credit in the Agreement is hereby deleted and replaced in its entirety with the following:

   ""Letter(s) of Credit" means one or more irrevocable, transferable standby letters of credit issued by a U.S. commercial bank or a foreign bank with a U.S. branch with such bank having a credit rating of at least A- from S&P or A3 from Moody's, in a

form acceptable to the Party in whose favor the letter of credit is issued.  Costs of a Letter of Credit shall be borne by the applicant for such Letter of Credit."

2.      Definitions.  All capitalized terms used in this Amendment (but not defined herein) shall have the same meaning ascribed to them in the Agreement.

3.      Entire Agreement.     The Agreement and the Exhibits hereto, together with this Amendment, constitute the entire agreement between the Parties and supersede any prior or contemporaneous agreements, proposal, solicitation definitions, terms and conditions, or representations of the Parties affecting the same subject matter.  Except as amended by this Amendment, the Agreement in its entirety shall continue in full force and effect.  No term hereof is to be construed against a Party on the ground that the Party is the author of that provision.

4.      Counterparts.  This Amendment may be executed in one or more counterparts, including in facsimile and electronic formats (including portable document format (.pdf)), each of which shall be deemed to be an original and all or which, when taken together, shall be deemed to constitute one and the same agreement.

5.      Headings.  Headings set forth in this Amendment are included for convenience only and are not to be considered in interpretation.

6.      Applicable Law.  THIS AMENDMENT  SHALL BE GOVERNED, CONSTRUED, ENFORCED AND PERFORMED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.

IN WITNESS WHEREOF, the Parties have executed this Amendment as of the Effective Date.


The Lower Colorado River Authority, a Texas conservation and reclamation district

By: _____

Name: _R. Kyle Jensen_____

Title: _Exec. Mgr Extrenal Affairs_____

2

Papalote Creek II, LLC

By: _____

Name: _____Tom Festle_____

Title: __Chief Financial Officer & Secretary__

Confidential

## AMENDEDED AND RESTATED SCHEDULE (ARS) A

These amended and restated scheduling procedures below ("Amended Scheduling Procedures") shall be effective as of January 25, 2011 (the "ARS Date"). If, after the ARS Date, any provisions in the ERCOT Nodal Protocols relevant to these Amended Scheduling Procedures are revised, amended or cancelled, the Parties shall amend these Amended Scheduling Procedures to make them consistent with the revised ERCOT Nodal Protocols and the original intention of the Parties.

## AMENDED SCHEDULING PROCEDURES

### Capacity Trades

In accordance with Section 4.2.2 (1) of the ERCOT Nodal Protocols, ERCOT is required to produce and update hourly a Short-Term Wind Power Forecast (STWPF) that provides a rolling 48-hour hourly forecast of wind production potential for each Wind-powered Generation Resource (WGR). ERCOT will produce and send the Seller (its QSE or designee) the STWPF for each hour for the Project. Seller shall send electronically to Buyer the STWPF within thirty (30) minutes of receiving it from ERCOT.

In accordance with Section 3.9.1 (7) of the ERCOT Nodal Protocols, Seller shall submit a Current Operating Plan (COP) to ERCOT that reflects an expected operating value for each hour in the first 48 hours of the COP that is less than or equal to the amount of the most recent STWPF for the Resource.

### *Day Ahead*

Seller (its QSE or designee) shall enter a Capacity Trade into the ERCOT system for the benefit of Buyer (its QSE or designee) equal to the lower of the hourly amount entered into the COP or the STWPF, by Hour Ending 1400 of the Day Ahead. Seller and Buyer shall submit the trade to ERCOT consistent with the provisions of Section 4 of the ERCOT Nodal Protocols. The intent of this trade is to provide Day Ahead Reliability Unit Commitment (DRUC) Capacity for the Buyer from the Project.

### *Adjustment Period*

Seller (its QSE or designee) shall enter a Capacity Trade into the ERCOT system for the benefit of Buyer (its QSE or designee) equal to the lower of the hourly amount entered into the COP or the STWPF, for each hour of the Adjustment Period thirty (30) minutes before the close of such Adjustment Period. Seller and Buyer shall submit the trade to ERCOT consistent with the provisions of Section 6 of the ERCOT Nodal Protocols. The intent of this trade is to provide Hourly Reliability Unit Commitment (HRUC) Capacity for the Buyer from the Project.

Confidential

**Energy Trade**

On or before 1000 after the Operating Day, Seller and Buyer will enter an Energy Trade for the Net Electricity delivered from the Project for the prior Operating Day. Seller and Buyer will resolve any difference in the Energy trade on or before 1430 so the Energy Trade can be validated by ERCOT. The intent of this trade is to transfer the ERCOT settlement for the actual Net Electricity generated by the Project from the Seller to the Buyer.

# EXHIBIT B



June 19, 2015

**Via UPS**
Papalote Creek Wind Farm II, LLC
Attention: Dominic Serpe
Vice President, Energy Contracts & Regulatory Compliance
353 N. Clark Street
30th Floor
Chicago, Illinois 60654

> Re:   Notice of Arbitration pursuant to Article 13 of that certain Power Purchase
>       Agreement ("PPA") dated December 18, 2009 between Papalote Creek
>       Wind Farm II, LLC ("Papalote") and Lower Colorado River Authority
>       ("LCRA").

Dear Sir/Madam:

Pursuant to Section 13.2 of the PPA, LCRA hereby initiates the arbitration process to
resolve the dispute between LCRA and Papalote regarding LCRA's limitation of liability
under the PPA and its impact on LCRA's performance obligations.  Senior officers and
executives of Papalote and LCRA met in person in an attempt to resolve the dispute but
have been unable to reach an agreement.

LCRA intends to continue to fully perform its obligations under the PPA during this
arbitration process.

LCRA is providing a copy of this notice to Sumitomo Mitsui Banking Corporation, as
required pursuant to Section 5 of the Consent to Assignment dated March 19, 2013.
We look forward to receiving your response pursuant to Section 13.2 of the PPA.

Very truly yours,

Phil Wilson
General Manager

cc:    Sumitomo Mitsui Banking Corporation
       277 Park Avenue
       New York, New York 10172
       Attn: Amena Nabi
       Attn: Carl Morales

# EXHIBIT A-3

## SERVICE REQUEST FORM



**VELVA L. PRICE**

District Clerk, Travis County

Civil Division (512) 854-9457

7/1/2015 3:36:02 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-15-002592**

# SERVICE REQUEST FORM

---

**REQUESTED BY:**

| | | | |
|---|---|---|---|
| **ATTORNEY/FILER:** Mary Coronado | | **SUBMITTED BY:** Mary Coronado | |
| **PHONE #:** 512-236-2258 | | **TITLE:** Legal Secretary | |
| **EMAIL:** mcoronado@jw.com | | **SIGNATURE:** /s/ Mary Coronado | |

---

**ISSUE PROCESS FOR:**

**CAUSE #:** D-1-GN-15-002592       **CASE STYLE:** LOWER COLORADO RIVER AUTHORITY v. PAPALOTE CREEK II, LLC f/k/a PAPALOTE CREEK WIND FARM II, LLC

---

**QUICK CITATION REQUEST: (FOR SERVICE OF CITATION ON ALL DEFENDANTS BY PERSONAL**

ISSUE CITATION TO ALL DEFENDANTS LISTED IN THE ORIGINAL PETITION AT THE ADDRESS SPECIFIED IN THE PETITION AND FORWARD THE CITATION(S) TO THE FOLLOWING:

☐TRAVIS CO. CONSTABLE (specify):          ☐CERTIFIED MAIL BY CLERK   ☐ATTORNEY/REQUESTER

☐PRIVATE PROCESS AGENCY (specify):        ☐I HAVE INCLUDED ATTACHMENTS TO THIS REQUEST (e.g. DISCOVERY) TO INCLUDE

---

**DETAILED SERVICE REQUEST: (ON PARTICULAR PARTIES, BY VARIOUS DELIVERY METHODS, OR FOR NON-CITATION**

**DESRIPTION OF INSTRUMENT(S) TO BE SERVED:**   PETITION TO COMPEL ARBITRATION

☐I HAVE INCLUDED ATTACHMENTS TO THIS REQUEST (e.g. discovery) TO INCLUDE IN THE CITATION

| TYPE OF PROCESS TO ISSUE: | ■CITATION ☐CERTIFIED NOTICE ☐PROTECTIVE ORDER* ☐TRO*^ ☐INJUNCTION*^ ☐SEQUESTRATION*^ ☐ATTACHMENT* ☐EXECUTION* ☐ABSTRACT* ☐SUPERSEDEAS^ ☐SCIRE FACIAS* ☐OTHER^ | |
|---|---|---|
| **\*SPECIFY TITLE AND DATE OF UNDERLYING ORDER IN CASE RECORD:** | **^ATTACH A COPY OF BOND AND/OR OTHER SUPPORTING DOCUMENT** | |

---

**SERVICE TO BE ISSUED:**

| PARTY NAME: Papalote Creek II, LLC f/k/a Papalote Creek Wind Farm II, LLC | EMAIL PROCESS TO: | SERVE VIA: |
|---|---|---|
| **PARTY TYPE:** Defendant | ☐TRAVIS CO. CONSTABLE | ☐PERSONAL SERVICE |
| | ■ATTORNEY/REQUESTOR | ☐CERTIFIED MAIL (BY CONSTABLE) |
| ☐USE ADDRESS IN ORIGINAL PETITION ☐SECRETARY OF STATE | ☐PRIVATE PROCESS AGENCY: | ☐CERTIFIED MAIL (BY CLERK) |
| ■OTHER ADDRESS: *SEE BELOW | Process Agency Name: | ☐CITATION BY POSTING* |
| | | ☐CITATION BY PUBLICATION* |
| PARTY NAME: | EMAIL PROCESS TO: | SERVE VIA: |
| | ☐TRAVIS CO. CONSTABLE | ☐PERSONAL SERVICE |
| **PARTY TYPE:** | ☐ATTORNEY/REQUESTOR | ☐CERTIFIED MAIL (BY CONSTABLE) |
| | ☐PRIVATE PROCESS AGENCY: | ☐CERTIFIED MAIL (BY CLERK) |
| ☐USE ADDRESS IN ORIGINAL PETITION ☐SECRETARY OF STATE | Process Agency Name: | ☐CITATION BY POSTING* |
| ☐OTHER ADDRESS: | | ☐CITATION BY PUBLICATION* |
| PARTY NAME: | EMAIL PROCESS TO: | SERVE VIA: |
| | ☐TRAVIS CO. CONSTABLE | ☐PERSONAL SERVICE |
| **PARTY TYPE:** | ☐ATTORNEY/REQUESTOR | ☐CERTIFIED MAIL (BY CONSTABLE) |
| | ☐PRIVATE PROCESS AGENCY: | ☐CERTIFIED MAIL (BY CLERK) |
| ☐USE ADDRESS IN ORIGINAL PETITION ☐SECRETARY OF STATE | Process Agency Name: | ☐CITATION BY POSTING* |
| ☐OTHER ADDRESS: | | ☐CITATION BY PUBLICATION* |

**\*THIS TYPE OF SERVICE MAY REQUIRE A COURT ORDER. ENTER DATE OF SERVICE ORDER IN CASE RECORD:**

ADDITIONAL INSTRUCTIONS FOR CLERK OR FOR OFFICER SERVING PROCESS:
*Please issue citation on Defendant through it's registered agent, CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas, 75201-3136

**FOR ADDITIONAL PARTIES TO BE SERVED, USE e-FILED PROCESS ISSUANCE REQUEST FORM ADDENDUM**

**AMALIA RODRIGUEZ-MENDOZA**
**TRAVIS COUNY DISTRICT CLERK**
**CIVIL DIVISION (512) 854-9457**

# SERVICE REQUEST FORM

| Cause #: | Case Style: | |
|---|---|---|

| PARTY NAME:<br><br>PARTY TYPE:<br><br>☐USE ADDRESS IN ORIGINAL PETITION ☐SECRETARY OF STATE<br>☐OTHER ADDRESS: | **EMAIL PROCESS TO:**<br>☐TRAVIS CO. CONSTABLE<br>☐ATTORNEY/REQUESTOR<br>☐PRIVATE PROCESS AGENCY:<br>Process Agency Name: | **SERVE VIA:**<br>☐PERSONAL SERVICE<br>☐CERTIFIED MAIL (BY CONSTABLE)<br>☐CERTIFIED MAIL (BY CLERK)<br>☐CITATION BY POSTING*<br>☐CITATION BY PUBLICATION* |
| PARTY NAME:<br><br>PARTY TYPE:<br><br>☐USE ADDRESS IN ORIGINAL PETITION ☐SECRETARY OF STATE<br>☐OTHER ADDRESS: | **EMAIL PROCESS TO:**<br>☐TRAVIS CO. CONSTABLE<br>☐ATTORNEY/REQUESTOR<br>☐PRIVATE PROCESS AGENCY:<br>Process Agency Name: | **SERVE VIA:**<br>☐PERSONAL SERVICE<br>☐CERTIFIED MAIL (BY CONSTABLE)<br>☐CERTIFIED MAIL (BY CLERK)<br>☐CITATION BY POSTING*<br>☐CITATION BY PUBLICATION* |
| PARTY NAME:<br><br>PARTY TYPE:<br><br>☐USE ADDRESS IN ORIGINAL PETITION ☐SECRETARY OF STATE<br>☐OTHER ADDRESS: | **EMAIL PROCESS TO:**<br>☐TRAVIS CO. CONSTABLE<br>☐ATTORNEY/REQUESTOR<br>☐PRIVATE PROCESS AGENCY:<br>Process Agency Name: | **SERVE VIA:**<br>☐PERSONAL SERVICE<br>☐CERTIFIED MAIL (BY CONSTABLE)<br>☐CERTIFIED MAIL (BY CLERK)<br>☐CITATION BY POSTING*<br>☐CITATION BY PUBLICATION* |
| PARTY NAME:<br><br>PARTY TYPE:<br><br>☐USE ADDRESS IN ORIGINAL PETITION ☐SECRETARY OF STATE<br>☐OTHER ADDRESS: | **EMAIL PROCESS TO:**<br>☐TRAVIS CO. CONSTABLE<br>☐ATTORNEY/REQUESTOR<br>☐PRIVATE PROCESS AGENCY:<br>Process Agency Name: | **SERVE VIA:**<br>☐PERSONAL SERVICE<br>☐CERTIFIED MAIL (BY CONSTABLE)<br>☐CERTIFIED MAIL (BY CLERK)<br>☐CITATION BY POSTING*<br>☐CITATION BY PUBLICATION* |
| PARTY NAME:<br><br>PARTY TYPE:<br><br>☐USE ADDRESS IN ORIGINAL PETITION ☐SECRETARY OF STATE<br>☐OTHER ADDRESS: | **EMAIL PROCESS TO:**<br>☐TRAVIS CO. CONSTABLE<br>☐ATTORNEY/REQUESTOR<br>☐PRIVATE PROCESS AGENCY:<br>Process Agency Name: | **SERVE VIA:**<br>☐PERSONAL SERVICE<br>☐CERTIFIED MAIL (BY CONSTABLE)<br>☐CERTIFIED MAIL (BY CLERK)<br>☐CITATION BY POSTING*<br>☐CITATION BY PUBLICATION* |
| PARTY NAME:<br><br>PARTY TYPE:<br><br>☐USE ADDRESS IN ORIGINAL PETITION ☐SECRETARY OF STATE<br>☐OTHER ADDRESS: | **EMAIL PROCESS TO:**<br>☐TRAVIS CO. CONSTABLE<br>☐ATTORNEY/REQUESTOR<br>☐PRIVATE PROCESS AGENCY:<br>Process Agency Name: | **SERVE VIA:**<br>☐PERSONAL SERVICE<br>☐CERTIFIED MAIL (BY CONSTABLE)<br>☐CERTIFIED MAIL (BY CLERK)<br>☐CITATION BY POSTING*<br>☐CITATION BY PUBLICATION* |
| PARTY NAME:<br><br>PARTY TYPE:<br><br>☐USE ADDRESS IN ORIGINAL PETITION ☐SECRETARY OF STATE<br>☐OTHER ADDRESS: | **EMAIL PROCESS TO:**<br>☐TRAVIS CO. CONSTABLE<br>☐ATTORNEY/REQUESTOR<br>☐PRIVATE PROCESS AGENCY:<br>Process Agency Name: | **SERVE VIA:**<br>☐PERSONAL SERVICE<br>☐CERTIFIED MAIL (BY CONSTABLE)<br>☐CERTIFIED MAIL (BY CLERK)<br>☐CITATION BY POSTING*<br>☐CITATION BY PUBLICATION* |
| PARTY NAME:<br><br>PARTY TYPE:<br><br>☐USE ADDRESS IN ORIGINAL PETITION ☐SECRETARY OF STATE<br>☐OTHER ADDRESS: | **EMAIL PROCESS TO:**<br>☐TRAVIS CO. CONSTABLE<br>☐ATTORNEY/REQUESTOR<br>☐PRIVATE PROCESS AGENCY:<br>Process Agency Name: | **SERVE VIA:**<br>☐PERSONAL SERVICE<br>☐CERTIFIED MAIL (BY CONSTABLE)<br>☐CERTIFIED MAIL (BY CLERK)<br>☐CITATION BY POSTING*<br>☐CITATION BY PUBLICATION* |
| PARTY NAME:<br><br>PARTY TYPE:<br><br>☐USE ADDRESS IN ORIGINAL PETITION ☐SECRETARY OF STATE<br>☐OTHER ADDRESS: | **EMAIL PROCESS TO:**<br>☐TRAVIS CO. CONSTABLE<br>☐ATTORNEY/REQUESTOR<br>☐PRIVATE PROCESS AGENCY:<br>Process Agency Name: | **SERVE VIA:**<br>☐PERSONAL SERVICE<br>☐CERTIFIED MAIL (BY CONSTABLE)<br>☐CERTIFIED MAIL (BY CLERK)<br>☐CITATION BY POSTING*<br>☐CITATION BY PUBLICATION* |
| PARTY NAME:<br><br>PARTY TYPE:<br><br>☐USE ADDRESS IN ORIGINAL PETITION ☐SECRETARY OF STATE<br>☐OTHER ADDRESS: | **EMAIL PROCESS TO:**<br>☐TRAVIS CO. CONSTABLE<br>☐ATTORNEY/REQUESTOR<br>☐PRIVATE PROCESS AGENCY:<br>Process Agency Name: | **SERVE VIA:**<br>☐PERSONAL SERVICE<br>☐CERTIFIED MAIL (BY CONSTABLE)<br>☐CERTIFIED MAIL (BY CLERK)<br>☐CITATION BY POSTING*<br>☐CITATION BY PUBLICATION* |
| PARTY NAME:<br><br>PARTY TYPE:<br><br>☐USE ADDRESS IN ORIGINAL PETITION ☐SECRETARY OF STATE<br>☐OTHER ADDRESS: | **EMAIL PROCESS TO:**<br>☐TRAVIS CO. CONSTABLE<br>☐ATTORNEY/REQUESTOR<br>☐PRIVATE PROCESS AGENCY:<br>Process Agency Name: | **SERVE VIA:**<br>☐PERSONAL SERVICE<br>☐CERTIFIED MAIL (BY CONSTABLE)<br>☐CERTIFIED MAIL (BY CLERK)<br>☐CITATION BY POSTING*<br>☐CITATION BY PUBLICATION* |

*This Type of Service may require a court order. Enter date of service order in case record:

# EXHIBIT A-4

## CITATION AND RETURN OF SERVICE FOR
## PAPALOTE CREEK II, LLC

C I T A T I O N

T H E   S T A T E   O F   T E X A S

**CAUSE NO. D-1-GN-15-002592**

LOWER COLORADO RIVER AUTHORITY

, Plaintiff

vs.

PAPALOTE CREEK II, LLC F/K/A PAPALOTE CREEK WIND FARM II, LLC

, Defendant

TO:  PAPALOTE CREEK II LLC
     BY SERVING ITS REGISTERED AGENT,
     CT CORPORATION SYSTEM
     1999 BRYAN STREET SUITE 900
     DALLAS, TEXAS 75201-3136

*Filed in The District Court
of Travis County, Texas*

JUL 15 2015

At _____3:30_____ ƠM.
Velva L. Price, District Clerk

Defendant, in the above styled and numbered cause:

**YOU HAVE BEEN SUED.** You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.

Attached is a copy of the PETITION TO COMPEL ARBITRATION of the PLAINTIFF in the above styled and numbered cause, which was filed on JUNE 30, 2015 in the 126TH JUDICIAL DISTRICT COURT of Travis County, Austin, Texas.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office, July 06, 2015.

REQUESTED BY:
ROBERT B NEBLETT III
100 CONGRESS AVE STE 1100
AUSTIN, TX 78701-4042
BUSINESS PHONE:(512)236-2000   FAX:(512)391-2135

Velva L. Price
**Travis County District Clerk**
**Travis County Courthouse**
**1000 Guadalupe, P.O. Box 679003 (78767)**
**Austin, TX 78701**

004125627

PREPARED BY: WINKLER PATRICIA

-- -- -- -- -- -- -- -- -- -- R E T U R N -- -- -- -- -- -- -- -- -- --

Came to hand on the __7__ day of __July__ , __2015__ at __5:10__ o'clock __P__ M., and executed at _____ within the County of _____ on the _____ day of _____, _____, at _____ o'clock _____M., by delivering to the within named _____, each in person, a true copy of this citation together with the **PETITION TO COMPEL ARBITRATION** accompanying pleading, having first attached such copy of such citation to such copy of pleading and endorsed on such copy of citation the date of delivery.

Service Fee: $ _____

Sworn to and subscribed before me this the

_____ day of _____, _____.

_____
Notary Public, THE STATE OF TEXAS

_____
Sheriff / Constable / Authorized Person

By:_____

_____
Printed Name of Server

_____ County, Texas

D-1-GN-15-002592

SERVICE FEE NOT PAID

P01 - 000031322

⬜ Original   ⬜ Service Copy

## CAUSE NO. D-1-GN-15-002592

## RETURN

Came to my hand on **7/7/2015 @ 5:10PM**, the following specified documents:

☒ Citation
☒ Petition To Compel Arbitration

and executed by me on:**7/9/2015 @ 9:50AM**, at:

**1999 Bryan Street, Suite 900, Dallas, Texas 75201** within the county of **Dallas**, by delivering to **Papalote Creek II LLC** by delivering to **CT Corporation System, its Registered Agent,** in person, by delivering to **Marie Garcia, employee/managing agent** a true copy of the above specified documents, having first endorsed on such copy the date of delivery.

I am over the age of 18; and I am not a party to or interested in the outcome of the above styled and numbered suit; and I declare under penalty of perjury that the above statements and facts are true and correct.

Keith Stalcup  SCH-0171
Expiration Date: 7/31/2017
ASSURED CIVIL PROCESS AGENCY
5926 Balcones Drive, # 290, Austin, TX 78731

**STATE OF TEXAS }**

### VERIFICATION

Before me, a notary public, on this day personally appeared the above named person, known to me to be the person whose name is subscribed to the foregoing document and, being by me first duly sworn, declared that the statements and facts therein contained are within his/her personal knowledge to be true and correct. Given under my hand and seal of office on this the **July 9, 2015**.

NOTARY PUBLIC

ROSE STALCUP
Notary Public, State of Texas
My Commission Expires
March 01, 2018