IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2016 FEB 24  PM 1:49

LOWER COLORADO RIVER AUTHORITY,
　　　　　　Plaintiff,

-vs-　　　　　　　　　　　　　　　　　　　　　　Case No. A-15-CA-656-SS

PAPALOTE CREEK II, LLC f/k/a Papalote
Creek Wind Farm II, LLC,
　　　　　　Defendant.

# ORDER

BE IT REMEMBERED on the 16th day of December 2015, the Court held a hearing in the above-styled cause, and the parties appeared by and through counsel. Before the Court is Plaintiff Lower Colorado River Authority's Opposed Motion to Compel Arbitration [#8], Defendant Papalote Creek II, LLC f/k/a Papalote Creek Wind Farm II, LLC's Response [#20] in opposition, Plaintiff's Reply [#27] in support, Defendant's Objections to the Affidavit of Richard Williams [#19],[1] and Plaintiff's Response [#28] thereto. Having reviewed the documents, the governing law, the arguments of the parties at hearing, and the file as a whole, the Court now enters the following opinion and orders.

## Background

Plaintiff Lower Colorado River Authority (LCRA), a conservation district and political subdivision of the State of Texas, brings this action against Defendant Papalote Creek II, LLC (Papalote), a wind energy company, seeking to compel Papalote to arbitrate a contract dispute. As

---

[1] As the Court considered none of the objected-to portions of the Affidavit of Richard Williams in reaching its decision, Papalote's objections are DISMISSED AS MOOT.

set forth below, the Court finds LCRA's motion to compel arbitration should be granted, as the dispute articulated by LCRA falls within the scope of the parties' valid agreement to arbitrate. Furthermore, although it appears there is a substantial question whether the parties' underlying dispute is ripe for adjudication, the Court leaves that issue for the arbitrator, lacking sufficient briefing not only on ripeness but also on the question whether ripeness issues in the context of a motion to compel arbitration should be decided by courts or by arbitrators.

On December 18, 2009, LCRA and Papalote executed a Power Purchase Agreement (the PPA) under which LCRA agreed to buy all of the energy produced by Papalote's wind farm, the Papalote Creek II Wind Project (the Project), at a fixed rate and through the year 2028. *See* Second Am. Pet. [#13] Ex. A (PPA) §§ 2.1, 3.1. Neither LCRA nor Papalote is presently in breach of the PPA; LCRA has, thus far, purchased all of the energy it contracted to buy, Papalote has produced all of the energy it contracted to produce, and all monies have been duly paid. Although no breach has occurred, a dispute has arisen between LCRA and Papalote concerning the proper interpretation of a clause in the PPA. It is this dispute LCRA seeks to arbitrate.

The dispute is a simple one. Under the PPA, in the event LCRA fails to purchase any of the energy produced by Papalote, LCRA is required to pay what the PPA terms "Liquidated Damages Due to Buyer's Failure to Take" in the amount specified by that provision. *See* PPA § 4.3. The PPA further contains a "Limitation on Damages" clause which provides that "Buyer's damages for failure to perform its material obligations under [the PPA] . . . shall . . . be limited in the aggregate to sixty million dollars." *Id.* § 9.3. Reading these two provisions together, LCRA, the buyer, claims that were it to purchase, over time, less than 100% of the energy produced by the Project, under the

Limitation on Damages clause, it would be obligated to pay Papalote for the failure to take only until the total amount paid reached $60 million. Papalote disagrees with this interpretation.[2]

Throughout April, May, and June 2015, LCRA and Papalote held a number of telephonic and in-person conferences in an attempt to resolve their differences regarding interpretation of the PPA's damages provision. Their efforts included a May 26, 2015 in-person meeting, held in LCRA's Austin office, attended by senior representatives from both entities. Unable to reach agreement, LCRA now seeks to invoke the PPA's arbitration provisions, found in Article 13 of the PPA:

> **13.1   Consultation.** If any dispute arises with respect to either Party's performance hereunder, the senior officers or executives of Buyer and senior officers or executives of Seller shall meet to attempt to resolve such dispute, either in person or by telephone, within five (5) Business Days after the written request of either Party. If such senior officers or executives are unable to resolve such dispute within ten (10) Days after their initial meeting (in person or by telephone), either Party may refer the dispute to the procedures outlined in the remainder of this Article 13.
>
> **13.2   Arbitration.** After the expiration of the ten (10) Day period described in Section 13.1 hereunder, either Party may submit any disputes arising under this Agreement, which cannot be resolved by the Parties to binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association . . . and the terms of this Section 13.2[.] . . . .
>
> The process shall be initiated by either Party delivering to the other a written notice requesting arbitration, with the other Party to respond to such request within ten (10) Business Days. . . .

PPA §§ 13.1, 13.2.

---

[2] Curiously, a straightforward statement of the legal basis for Papalote's disagreement is conspicuously absent from the pleadings. The affidavit of Richard Williams, LCRA's Chief Financial Officer, however, provides a clue. Williams states that on June 10, 2015, during a phone call with Papalote representatives, "[Papalote's Chief Financial Officer] stated that LCRA would be very unhappy once LCRA looked at the Consent to Assignment of Rights with the Sumitomo M[i]tsui Banking Corporation . . . which Papalote said would prevent LCRA from taking the position that its liability was capped at $60 million." Mot. Compel [#8-1] Ex. A (Williams Aff.) ¶ 7(j). Sumitomo became involved with Papalote and LCRA when, several years after the PPA was executed, Sumitomo served as collateral agent for a group of financial institutions which provided Papalote with financing to build the Project. *See* Mot. Disqualify [#17-1] Ex. 1 (Fried Decl.) ¶ 9.

LCRA made written demand for arbitration on Papalote on June 19, 2015. *See* Resp. Mot. Compel [#20-3] Ex. C (Demand Letter). Papalote responded on June 24, 2015, stating the demand "is premature, violates Article 13, and does not constitute a proper and valid notice of arbitration under the PPA." *Id.* [#20-4] Ex. D (Demand Letter Resp.).

On June 30, 2015, LCRA filed its original petition to compel arbitration against Papalote. *See* Notice Removal [#1-1] Ex. A-2 (Pet. Compel Arbitration). Papalote removed the suit to this Court on August 3, 2015, invoking the Court's diversity jurisdiction. *See id.* [#1] ¶ 4. LCRA filed the instant motion to compel arbitration on August 28, 2015, and Papalote responded on October 9, 2015. *See* Mot. Compel [#8]. Before turning to the motion to compel arbitration, however, the Court first took up intervenor Sumitomo Mitsui Banking Corporation's motions to intervene and to disqualify,[3] and held a hearing on those matters on November 6, 2015. Following that hearing, LCRA's former counsel, Jackson Walker LLP, moved to withdraw and for substitution of counsel. *See* Mot. Withdraw [#35]. The Court granted that motion. *See* Order of Nov. 20, 2015 [#37].

On December 16, 2015, with the intervention and disqualification issues resolved, the Court held a hearing on the motion to compel arbitration. The motion is now ripe for decision.

## Analysis

### I. Legal Standard

In determining the arbitrability of a dispute, this Court is guided by "four general principles" enunciated by the United States Supreme Court. *Tittle v. Enron Corp.*, 463 F.3d 410, 418 (5th Cir. 2006). First, because arbitration is a creature of contract, "a party cannot be required to submit to

---

[3] Sumitomo's Motion to Intervene for the Limited Purpose of Resolving Its Motion to Disqualify Plaintiff's Counsel [#17], which remains pending on the docket, is DISMISSED AS MOOT.

-4-

arbitration any dispute which he has not agreed to submit." *Id.* (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)). Second, the threshold question of whether the parties agreed to arbitrate is one for the courts, not the arbitrator, unless "the parties clearly and unmistakably provide otherwise." *Id.* Third, this Court is not to consider the merits of the claims in determining arbitrability. *Id.* Fourth, "where the contract contains an arbitration clause, there is a presumption of arbitrability." *Id.* (quoting *AT&T Techs.*, 475 U.S. at 650). The presumption of arbitrability requires this Court to resolve any ambiguities as to the scope of the arbitration agreement in favor of arbitration. *Id.*

Mindful of these guiding principles, this Court conducts a two-step analysis in deciding whether to compel arbitration under the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq. Id.* The first step is to "determine whether the parties agreed to arbitrate the dispute in question." *Id.* This step involves two inquiries: "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Id.* (quoting *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996)). The second step is to "determine whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." *Id.* As LCRA correctly points out, as "the party resisting arbitration[,]" Papalote "shoulders the burden of proving that the dispute is not arbitrable." *Overstreet v. Contigroup Companies, Inc.*, 462 F.3d 409, 412 (5th Cir. 2006) (citing *Am. Heritage Life Ins. Co. v. Lang*, 321 F.3d 533, 539 (5th Cir. 2003)).

II. **Application**

The parties agree that Article 13 is a valid and enforceable arbitration provision. *See* Def.'s Resp. [#20] at 4. Consequently, under the first step of the analysis, the only question before the

Court is whether the dispute in question falls within the scope of Article 13. *See Tittle*, 463 F.3d at 418.

LCRA begins by arguing its dispute with Papalote over the correct interpretation of the PPA's damages provision falls within the arbitration clause because it is a "dispute[] arising under this Agreement" within the meaning of § 13.2. LCRA notes § 13.2 uses the broad phrase "any dispute," and contends the instant dispute clearly "aris[es] under this Agreement" because it concerns the interpretation of a provision of the PPA.

In response, Papalote takes the position it is not the phrase "any dispute" in § 13.2 which controls. Instead, Papalote points to § 13.1, which refers to "any dispute . . . with respect to either Party's performance [under the PPA]." PPA § 13.1. Papalote points out § 13.1 and § 13.2 are linked, as § 13.1 provides that only *after* the initial consultation it requires may a dispute be "refer[red] . . . to the procedures outlined in the remainder of this Article 13." PPA § 13.1. In Papalote's view, § 13.2 confirms this reading by stating that "[a]*fter* the expiration of the ten (10) Day period described in Section 13.1 . . . , any disputes arising under this Agreement" may be submitted to arbitration. *Id.* § 13.2 (emphasis added).

As the parties agree, the Court must apply Texas law in construing the PPA and determining whether the parties agreed to arbitrate this matter. *See Tittle*, 463 F.3d at 419 (citing *Wash. Mut. Fin. Grp. v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004) ("[I]n determining whether the parties agreed to arbitrate a certain matter, courts apply the contract law of the particular state that governs the agreement.")). Under Texas law, a court construing a contract must read the contract in a manner that confers meaning to all its terms, rendering the terms consistent with one another. *Id.* (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). In so doing, courts must "examine and consider

the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless . . . . No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Id.* (quoting *Coker*, 650 S.W.2d at 393). In harmonizing the provisions of the contract, "terms stated earlier in an agreement must be favored over subsequent terms." *Coker*, 650 S.W.2d at 393 (citing *Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 335 (Tex. 1983)).

Applying these principles, the Court agrees with Papalote that the parties agreed to arbitrate only those disputes which "arise[] with respect to either Party's performance" under the PPA. Section 13.1, which comes first, acts as a gate-keeping provision: it is only when the parties are "unable to resolve" their "dispute [which] ar[ose] with respect to either Party's performance" that "either Party may refer the dispute to the procedures outlined in the remainder of this Article 13." *See Coker*, 650 S.W.2d at 393 (earlier terms must be favored over subsequent terms). Section 13.2 does not apply at all until the parties have exhausted § 13.1, which requires the parties confer via phone or in person concerning their dispute and then wait ten days before escalating it to the next stage, outlined in § 13.2. That § 13.2 does not qualify "any dispute" is simply irrelevant. Accepting LCRA's contrary position would impermissibly isolate § 13.2 from § 13.1, render the linkage between § 13.1 and § 13.2 meaningless, and elevate a general phrase over a specific one. Each of those consequences contravenes a Texas canon of construction. *See Coker*, 650 S.W.2d at 393; *Tittle*, 463 F.3d at 419; *NuStar Energy, L.P. v. Diamond Offshore Co.*, 402 S.W.3d 461, 466 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("To the extent of any conflict, specific provisions control over more general ones." (quoting *Grynberg v. Grey Wolf Drilling Co.*, 296 S.W.3d 132, 137 (Tex. App.—Houston [14th Dist.] 2009, no pet.))). LCRA's argument is therefore rejected.

Because only those disputes which arise with respect to either party's performance under the PPA fall within the scope of the PPA's arbitration provision, the dispositive question becomes whether the dispute LCRA seeks to arbitrate—whether or not LCRA's liability would be capped at $60 million in the event it elected to purchase from Papalote less than the total amount of energy it contracted to buy—qualifies as a dispute "with respect to either Party's performance" under the PPA.

Papalote urges that LCRA has not and cannot present a performance-related dispute at this time, as all parties are fully performing their obligations under the PPA at present. In Papalote's view, its dispute with LCRA concerns LCRA's potential liability for damages in the event of breach, not a performance obligation. *See* Resp. [#20] at 13. Disagreeing, LCRA characterizes its obligation to pay Papalote if it fails to purchase 100% of the energy produced by the Project as "among the primary performance obligations that LCRA has under the PPA." Reply [#27] at 3. This is so, LCRA argues, because the PPA permits LCRA to cure a failure to take through the payment of money, thereby keeping the PPA in full force and effect even if LCRA fails to meet its energy-purchasing obligations. *See id.* at 3 ("Papalote would have no right to terminate the PPA [if LCRA pays the specified liquidated damages]."). Additionally, LCRA points out that Papalote's argument highlighting the absence of a present breach is, in reality, a ripeness argument, and states questions of ripeness are for the arbitrator, not the Court.

The Court finds LCRA has presented a performance-related dispute. It is true that in a certain sense, one could understand "performance" to concern only those promises which were the essence of the PPA—the sale and production of wind energy—and conceptualize the buyer's obligation to pay for failing to take as compensation for its failure to perform, rather than as an independent

performance obligation. *See Huffhines v. Bourland*, 280 S.W. 561, 562–63 (Tex. 1926)[4] ("Where . . . the terms of the contract . . . bind the seller . . . to accept such sum in satisfaction of the obligations of the . . . purchaser, the contract will be construed as giving to the latter . . . an option either to perform his obligation to purchase . . . , or, failing in that, to stand bound to pay to the seller such stipulated sum as liquidated damages"). The Court believes the better view here, however, is that LCRA's bargained-for obligation to pay Papalote a specified sum if LCRA takes less than all of the energy produced is itself a performance obligation under the PPA.

The Court reaches this conclusion because LCRA's failure to take is not treated by the PPA as a breach giving Papalote the right to suspend performance and terminate the PPA. Rather, Papalote's "exclusive remedy" for LCRA's failure to take, absent other circumstances not applicable here,[5] is the payment of money. *See* PPA § 4.3 (articulating "Seller's exclusive remedy hereunder" for "Buyer's Failure to Take"). Section 4.3 of the PPA thus contemplates a continuation of the parties' relationship upon LCRA's failure to take, so long as the payment is made—not a suit for breach and to enforce the liquidated damages provision. In contrast, were LCRA to fail to make the

---

[4] Because this Commission of Appeals opinion was adopted and entered as the judgment of the Texas Supreme Court, *see Huffhines*, 280 S.W. at 563, it is cited as an opinion of the Texas Supreme Court. *See* THE GREENBOOK: TEXAS RULES OF FORM § 5.2.2, at 35 (13th ed. 2015).

[5] The relevant provision reads in full:

**4.3    Liquidated Damages Due to Buyer's Failure to Take.** As Seller's exclusive remedy hereunder if . . . Buyer fails to take any of Net Electricity at the Delivery Point and such failure to take is not excused pursuant to the terms of this Agreement, . . . or . . . Seller suspends performance due to a Buyer Event of Default, then Buyer shall pay Seller . . . an amount equal to the product of . . . the positive difference, if any, obtained by subtracting . . . the Sales Price from . . . the Contract Price, multiplied by . . . the sum of Net Electricity and any Deemed Generated Energy during the term period of such . . . suspension, plus costs reasonably incurred by Seller; provided, however, . . . that if Seller fails to make available to Buyer fifty percent (50%) or more of the applicable Monthly Minimum Contract Amounts for a consecutive period of sixty (60) Days, all remedies in Section 6.2 shall be available to Seller.

PPA § 4.3. It is only when "Seller fails to make available to Buyer fifty percent or more of the applicable Monthly Minimum Contract Amounts for a consecutive period of sixty Days" that termination is available as a remedy subsequent to the buyer's failure to take. *See id.*; PPA § 6.2 (listing "Default Remedies").

payment, that failure would constitute an "Event of Default" permitting Papalote to suspend its performance and terminate the agreement. *See* PPA § 6.1 (listing among "Events of Default" the "[f]ailure by a Party to make any payment required hereunder when due"); *id.* § 6.2 (listing remedies available upon occurrence of an "Event of Default"). As such, the Court finds LCRA's obligation to pay money pursuant to § 4.3 is a performance obligation under the PPA.

As for the second prong of the inquiry: although neither party expressly identified ripeness as a "legal constraint[] external to the parties' agreement [that] foreclose[s] the arbitration of [LCRA's] claim," *Tittle*, 463 F.3d at 418, ripeness questions plainly loom, as neither party is presently in breach of the PPA. Given the parties' failure to brief ripeness at all and to adequately brief the question whether ripeness should be decided by the courts or the arbitrators, however, the Court leaves both issues for another day. *See Ace Am. Ins. Co. v. Huntsman Corp.*, 255 F.R.D. 179, 210 (S.D. Tex. 2008) ("[I]f it is determined that arbitration is warranted, questions of the ripeness of the underlying disputes between IRIC and the Reinsurers ultimately may be determined by the arbitrators."). LCRA's Second Amended Petition to Compel Arbitration, moreover, asks for nothing more than what its title reveals; there is no request for declaratory judgment on the merits of the dispute (which may, in itself, provide all the commentary on the ripeness question that is necessary). Papalote is, of course, free to raise any ripeness arguments before the arbitrator.

In sum, the parties' arbitration agreement is valid, the dispute LCRA has articulated falls within the scope of the arbitration provision, and the parties have identified and argued no legal constraints external to the agreement that foreclose the arbitration of this claim. As such, the Court grants LCRA's motion to compel arbitration.

## Conclusion

As LCRA's presently live pleading seeks only to compel Papalote to arbitrate, resolution of LCRA's motion disposes of this suit. Judgment in favor of LCRA is due to be granted. Accordingly:

IT IS ORDERED that Sumitomo Mitsui Banking Corporation's Motion to Intervene for the Limited Purpose of Resolving Its Motion to Disqualify Plaintiff's Counsel [#17] is DISMISSED AS MOOT;

IT IS FURTHER ORDERED that Defendant Papalote Creek II, LLC's Objections to the Affidavit of Richard Williams [#19] are DISMISSED AS MOOT; and

IT IS FINALLY ORDERED that Plaintiff Lower Colorado River Authority's Opposed Motion to Compel Arbitration [#8] is GRANTED. The parties are ordered to arbitrate their claims in the manner provided for in the arbitration agreement, pursuant to 9 U.S.C. § 4.

SIGNED this the 24th day of February 2016.

/s/ Sam Sparks
SAM SPARKS
UNITED STATES DISTRICT JUDGE